# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Jackson*, **2012 IL App (1st) 103300**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TOMMY JACKSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3300 |
| Filed | October 26, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for unlawful use of a weapon by a felon was upheld where the arresting officers had a reasonable suspicion for a *Terry* stop and a protective patdown of defendant's person and his backpack they conducted based on defendant's presence in a "high-crime" area, his bizarre actions when confronted, and their concern for their safety and the safety of others in the area. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-13057; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Adrienne N. River, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Peter Fischer, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justice Palmer concurred in the judgment and opinion.

Justice Garcia dissented, with opinion.

## OPINION

¶ 1 Following a bench trial, defendant Tommy Jackson was convicted of two counts of unlawful use of a weapon by a felon. After hearing factors in aggravation and mitigation, he was sentenced as a Class X offender to 74 months in the Illinois Department of Corrections due to his criminal background. On appeal, defendant argues that the loaded handgun found in his backpack should have been suppressed because police officers lacked both (1) a reasonable suspicion to justify the *Terry* stop and (2) a reasonable belief that he was armed and dangerous which was needed to justify the frisk. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3 Defendant was convicted of two counts of unlawful use of a weapon by a felon after a combined suppression hearing and bench trial. Chicago police officer Gary Anderson was the only witness that testified.

¶ 4 Officer Anderson testified that he had been on the force for three years, and that shortly after midnight on July 7, 2010, he was driving a marked squad vehicle with his partner. As he drove eastbound in the 3900 block of West Ferdinand Street in Chicago, he observed defendant with a backpack "walking westbound on Ferdinand at a rapid pace" and observed that defendant was watching his vehicle. We take judicial notice of the fact that this address is within the Humboldt Park neighborhood of Chicago. About 10 minutes later, Anderson observed defendant walking south on Pulaski toward Ferdinand. Anderson observed defendant "walking again at a rapid pace and this time paying more attention to us." Defendant "was directing his attention towards us the whole time that we drove by."

¶ 5 As the officers drove past defendant a second time, they noticed unusual behavior by defendant in that "we could see that he was still looking at us even when we had already passed him." The officers circled the block to return to defendant "to conduct a field

-2-

interview." Officer Anderson described the stop as follows:

"Q. And what was the defendant doing at the time that you stopped your car?

A. When we stopped our car, he was standing on the corner.

Q. What, if anything, was the defendant doing?

A. When we got out of the our car, he began to act a little erratic.

Q. When you say he acted erratic, what do you mean by that?

A. He began speaking before we even asked any questions, moving his arms, flailing about, moving backwards.

Q. You said he was speaking?

A. I couldn't even understand what he was saying.

Q. What did your partner do after you stopped your vehicle?

A. We told him to put his hands on the hood of the car.

Q. And what was the purpose in doing that?

A. Officer safety.

Q. Did the defendant comply?

A. No, he did not.

Q. What did you do next?

A. We repeatedly asked him to put his hands on the vehicle.

Q. And at any time while you were out there, did the defendant put his hands on the vehicle?

A. He repeatedly put them on and take them off [*sic*].

Q. What was he doing with his arms while you were approaching him?

A. Pointing, flailing, all kinds of movements.

Q. At that point when the defendant refused to keep his hands on the vehicle, what did you do?

A. We detained him.

Q. When you say you detained him, how did you go about doing that?

A. We put his hands in cuffs."

¶ 6  Anderson testified that he performed a "protective pat down" of defendant and his backpack after defendant was handcuffed. In manipulating the backpack, the officer felt a "large metal object" he believed was the barrel of a gun. The officer opened the backpack and observed a handgun, which was loaded. The officers then took possession of the backpack and arrested defendant.

¶ 7  On cross-examination, Anderson testified that he and his partner exited their vehicle and approached defendant. Anderson did not recall if he asked defendant what was in his backpack. The officer testified that, as defendant started to speak, defendant moved backward and spoke before either officer had asked defendant a question. Anderson instructed defendant to place his hands on the hood of the squad vehicle and removed the

backpack from defendant's shoulders. Anderson then placed the backpack on the hood of the squad vehicle before handcuffing defendant's hands behind his back.

¶ 8    On redirect examination, Anderson described the area in which these events took place as a "high violence, high narcotics trafficking area," where he had made arrests for violent and drug-related crimes before. Specifically, Officer Anderson testified:

"Q. And how would you describe the area that he was walking in?

A. It's a high violence, high narcotics trafficking area.

Q. Have you yourself made arrests in that area for those things before?

A. Yes, I have."

The trial court then asked "[r]ecross?" and defense counsel replied that she had no further questions "based on that."

¶ 9    After hearing argument, the trial court denied defendant's motion to quash the arrest and suppress the evidence. The trial court found credible the officer's testimony that this was a "high violence, high narcotics trafficking area"; and that defendant's actions were "erratic." The trial court held that, after the officers exited their vehicle and approached defendant, defendant's erratic actions, including his placing his hands on the police vehicle and removing them, provided the reasonable suspicion needed to justify an investigative stop. The trial court determined that, based on the totality of the circumstances, the detention of defendant and the subsequent patdown search of his backpack were warranted. The trial court then found defendant guilty of the charged offenses.

¶ 10    ANALYSIS

¶ 11    The sole issues on this appeal concern whether the officers had the reasonable suspicion needed for a *Terry* stop and frisk. On appeal, defendant argues, first, that the officers lacked the reasonable suspicion needed to support an investigative stop. Defendant argues, second, that, even if the investigative stop was proper, the police lacked the justification to perform a protective patdown of his person and his backpack. Defendant asks that we reverse the trial court's denial of his suppression motion. For the following reasons, we affirm.

¶ 12    I. Standard of Review

¶ 13    When reviewing a trial court's ruling on a motion to suppress, we accord great deference to the trial court's factual findings. *People v. Close*, 238 Ill. 2d 497, 504 (2010). We will reverse a trial court's findings of fact only if they are against the manifest weight of the evidence. *People v. Bunch*, 207 Ill. 2d 7, 13 (2003). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 14    However, we review *de novo* the trial court's ultimate legal ruling as to whether suppression was warranted. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004); *In re Mario T.*, 376 Ill. App. 3d 468, 472 (2007) ("Our focus *** is on the legal question of the justification of the stop and frisk so as to warrant the denial of the *** motion to suppress ***."). *De*

*novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). The ultimate legal question in the case at bar is whether the handgun should have been suppressed, which is a question that we consider *de novo*. *Mario T.*, 376 Ill. App. 3d at 472-73 ("whether the motion should have been granted necessarily turns on a reviewing court's 'own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted' " (quoting *Pitman*, 211 Ill. 2d at 512)).

¶ 15                                  II. Stop and Search Law

¶ 16      Under the fourth amendment to the United States Constitution (U.S. Const., amend. IV), a police officer may lawfully stop a person for brief questioning when the officer reasonably believes that the person has committed, or is about to commit, a crime. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). The Illinois legislature codified the *Terry* standard, which provides in relevant part,

> "Temporary Questioning without Arrest. A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense *** and may demand the name and address of the person and an explanation of his actions." 725 ILCS 5/107-14 (West 2008).

Stated in other words, the *Terry* standard allows the police to conduct a brief investigative stop "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The investigative stop must be justified at its inception. *Terry*, 392 U.S. at 19-20. However, the officer does not need probable cause to justify a *Terry* stop. *Close*, 238 Ill. 2d at 505 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

¶ 17      A *Terry* stop permits the police to investigate situations or circumstances that provoke suspicions, to either confirm or dispel those suspicions. *Close*, 238 Ill. 2d at 512. To justify an investigative stop, the police must articulate the facts that, taken together with natural inferences, warrant an investigative intrusion, "such as when the officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *People v. Ertl*, 292 Ill. App. 3d 863, 868-69 (1997). A *Terry* stop requires "more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity." *Wardlow*, 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27); see also *People v. Gherna*, 203 Ill. 2d 165, 181 (2003).

¶ 18      The validity of an investigative stop turns on the totality of the circumstances known to the officers at the time. *Pitman*, 211 Ill. 2d at 512. Once a *Terry* search is conducted, it is the State's burden to show that the search is constitutional. *People v. Rushing*, 272 Ill. App. 3d 387, 390 (1995); *Mario T.*, 376 Ill. App. 3d at 474 ("it was the State's burden to justify the pat-down search of the respondent").

¶ 19      Even if an investigative stop is warranted based on a reasonable suspicion that criminal activity is afoot, a police officer needs more to justify a subsequent frisk. To justify a

protective patdown of a properly detained citizen for possible weapons, the State must demonstrate that the investigating officers had a reasonable belief that the defendant was armed and dangerous. See *People v. Galvin*, 127 Ill. 2d 153, 164 (1989) (stop valid, search not valid); *People v. Rivera*, 272 Ill. App. 3d 502, 506-07 (1995) (stop justified, search not justified).

¶ 20                               III. Factors in the Case at Bar

¶ 21     In the instant case, the trial court made two factual findings in upholding the validity of the stop: (1) defendant's presence in a "high-crime" area, and (2) defendant's bizarre actions upon being confronted by the police. See *Mario T.*, 376 Ill. App. 3d at 474-81; *People v. Harris*, 2011 IL App (1st) 103382, ¶ 12. Whether an area is a high-crime area and whether a defendant's conduct was bizarre are factual issues. *Harris*, 2011 IL App (1st) 103382, ¶ 13 ("Whether an area has a high level of crime is a factual issue."). For the following reasons, we find that the trial court's factual findings on these issues were not against the manifest weight of the evidence and that these two factual findings are sufficient to support the trial court's legal conclusion.

¶ 22     A defendant's presence in an area of expected criminal activity, by itself, does not constitute a reasonable, particularized suspicion that defendant either committed or was about to commit a crime. *Wardlow*, 528 U.S. at 124 ("[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime"); *Mario T.*, 376 Ill. App. 3d at 476 (respondent's presence in so-called high-narcotics area is "no different from the presence of others" the officers may have encountered); *People v. Linley*, 388 Ill. App. 3d 747, 752 (2009) (defendant's presence in a residential area at a "late hour" does not justify an investigative stop, even when the area is known for frequent criminal activity).

¶ 23     However, in *Wardlow*, the United States Supreme Court found that flight, plus presence in a high-crime neighborhood, equaled reasonable suspicion. *Wardlow*, 528 U.S. at 123 ("flight combined with the fact that it occurred in a high crime area supported a finding of reasonable suspicion"). Similarly, in the case at bar and for the reasons explained below, we find that defendant's bizarre conduct, plus his presence in a high-crime neighborhood, constituted reasonable suspicion.

¶ 24                               IV. High-Crime Area

¶ 25     Defendant argues, first, that Officer Anderson's testimony, by itself, that the area was a high-crime area was insufficient evidence for the trial court to find that the location was, in fact, a high-crime area. The dissent agrees with defendant on this point. However, we all agree that *Illinois v. Wardlow* is the governing law, so an in-depth discussion of that case is the best place to start our review of this issue.

¶ 26     In *Wardlow*, a caravan of four police vehicles drove down a street in Chicago, and defendant looked at them and fled. *Wardlow*, 528 U.S. at 121-22. One of the officers then stopped his vehicle and detained defendant. *Wardlow*, 528 U.S. at 122. During the course of a protective patdown search, the officers recovered a handgun, and defendant was

subsequently charged with unlawful use of a weapon by a felon. *Wardlow*, 528 U.S. at 122.

¶ 27    At the pretrial suppression hearing in *Wardlow*, the officer testified that he had gone to this area because it was " 'one of the areas in the 11th District that's high narcotics traffic.' " *People v. Wardlow*, 287 Ill. App. 3d 367, 369 (1997). The trial court denied defendant's motion to suppress and defendant was subsequently convicted. *Wardlow*, 287 Ill. App. 3d at 369.

¶ 28    On appeal, the appellate court held that there was "no support" in the record to support the finding that this was a high narcotics-trafficking area. *Wardlow*, 287 Ill. App. 3d at 371. The appellate court listed factors that could have provided support, such as: (1) "precise" boundaries of the area known for narcotics trafficking; or (2) a nexus between "that area" and the officer's investigation. *Wardlow*, 287 Ill. App. 3d at 370-71. As a result, the appellate court reversed the trial court's ruling. *Wardlow*, 287 Ill. App. 3d at 371.

¶ 29    Our supreme court rejected the appellate court's holding that the record contained no support for the trial court's finding that this was a high narcotics-trafficking area. *People v. Wardlow*, 183 Ill. 2d 306, 310-11 (1998). Rejecting the appellate court's proposed factors, our supreme court held that "Officer Nolan's uncontradicted and undisputed testimony, which was accepted by the trial court, was sufficient to establish that the incident occurred in a high-crime area." *Wardlow*, 183 Ill. 2d at 310-11; see also *Illinois v. Wardlow*, 528 U.S. 119, 122 (2000) (the Illinois Supreme Court "reject[ed] the Appellate Court's conclusion that Wardlow was not in a high crime area"). However, the Illinois Supreme Court affirmed on other grounds, finding that "an individual's flight upon the approach of a police vehicle patrolling a high-crime area" was *not* sufficient to justify a *Terry* top. *Wardlow*, 183 Ill. 2d at 311.

¶ 30    The United States Supreme Court accepted our supreme court's conclusions that this was "an area known for heavy narcotics trafficking" and that defendant had fled at the approach of the police. *Wardlow*, 528 U.S. at 124. However, unlike our supreme court, the United States Supreme Court concluded that these two factors *were* sufficient to justify a *Terry* stop. *Wardlow*, 528 U.S. at 124-25. Thus, the United States Supreme Court's decision left intact our supreme court's holding that the officer's "uncontradicted and undisputed testimony, which was accepted by the trial court, was sufficient to establish that the incident occurred in a high-crime area." *Wardlow*, 183 Ill. 2d at 310-11.

¶ 31    In the case at bar, the dissent wants us to find the opposite of our supreme court. Specifically, the dissent wants us to find that an officer's uncontradicted and undisputed testimony is *not* enough to establish that the incident occurred in a high-crime area. In support, the dissent cites the appellate court's decision in *People v. Harris*, 2011 IL App (1st) 103382, and specifically the *dicta* in *Harris* which states: "A conclusory and unsubstantiated statement that a location is 'a high crime area' is insufficient to establish that consideration for purposes of justifying a *Terry* stop." *Harris*, 2011 IL App (1st) 103382, ¶ 14. However, if one views *Harris* in light of its procedural posture, its holding and the holding of our supreme court in *Wardlow* are not in conflict.

¶ 32    In *Harris*, the trial court stated that the area at issue was no more a high-crime area than any other neighborhood in Chicago, and the trial court granted the defendant's motion to

suppress. *Harris*, 2011 IL App (1st) 103382, ¶ 13; see also *id*. ¶ 15 (observing that "the trial court rejected" the officer's contention that this area was known for its high burglary and robbery rate). Thus, it was the State that was appealing. Thus, the State had the burden of proving that the trial court's implicit finding–that this was *not* a high crime area–was against the manifest weight of the evidence.

¶ 33    The appellate court affirmed the trial court, and it observed in *dicta* the types of evidence that the State could have presented but did not, such as the precise boundaries of the area known for this type of crime, or a nexus between this area and the officer's investigation. *Harris*, 2011 IL App (1st) 103382, ¶¶ 14, 15. These were the same factors listed by the appellate court in *Wardlow*, 287 Ill. App. 3d at 370-71, that were found to be *not* required by our supreme court in *Wardlow*. As we observed above, our supreme court held in *Wardlow* that an "[officer's] uncontradicted and undisputed testimony, which was accepted by the trial court, was sufficient"–by itself–"to establish that the incident occurred in a high-crime area." *Wardlow*, 183 Ill. 2d at 310-11.

¶ 34    The best way to harmonize *Harris* and *Wardlow* is to remember the procedural posture of each case. In *Harris*, the trial court did *not* find this to be a high-crime area, and the State was left with the task of showing that this conclusion was against the manifest weight of the evidence–which it could not do. By contrast, in *Wardlow*, the trial court *did* find this to be a high-crime area, and it was the defense who had the burden of showing that this conclusion was against the manifest weight of the evidence–which it also could not do. The bottom line in both cases is that the trial court's factual findings, concerning whether this is or is not a high-crime area, are entitled to a great deal of deference.

¶ 35    Thus, we reject defendant's argument and find, as our supreme court did in *Wardlow*, that an officer's uncontradicted and undisputed testimony, which is accepted by the trial court, is sufficient to support a trial court's finding that the incident occurred in a high-crime area. *Wardlow*, 183 Ill. 2d at 310-11.

¶ 36    To rule otherwise, as the dissent asks us to do, would be to put requirements on a police officer's testimony that we do not put on any other witness's testimony. If any other witness testified to a fact, and his or her testimony went uncontradicted and undisputed in the courtroom, and the trial court listened to the testimony and found it credible, we would most likely hold that the trial court's finding was not against the manifest weight of the evidence. It would be difficult for us to rule otherwise, if there was no countervaling evidence against it. The question then becomes why should we single out the testimony of police officers for greater scrutiny and greater requirements than we do for other witnesses? The answer, of course, is that we should not.

¶ 37    In addition, even if we were to accept the *Harris* factors, we would reach the same conclusion on the facts before us. In *Harris*, the prosecutor asked one of the police officers whether the location, in which he observed defendant, was a high-crime area and the officer responded affirmatively. *Harris*, 2011 IL App (1st) 103382, ¶ 13. However, the officer did not provide any further explanation of the high-crime nature of the area.

¶ 38    If the officer had testified about his experience in the area, his testimony would no longer have been conclusory or unsubstantiated. For example, in *In re F.R.*, 209 Ill. App. 3d 274

(1991), a police officer testified that he observed defendant at an intersection that was "a known drug trafficking area and that he ha[d] observed drug transactions occurring at that intersection approximately 25 times" and that he had made roughly one dozen drug arrests at that intersection. *F.R.*, 209 Ill. App. 3d at 275-76. The officer further testified that he observed defendant act in a manner consistent with the previous drug transactions he had observed at the intersection, but that he was unable to hear anything defendant said during the supposed transaction, nor did he actually observe an exchange of drugs and money. *F.R.*, 209 Ill. App. 3d at 276-77. We held that, although the officer did not hear anything defendant said or observe an exchange, his testimony that the intersection was a high-crime area, coupled with his testimony that defendant's actions were consistent with previous drug transactions that the officer had observed at the intersection, gave the officer sufficient justification to stop the defendant. *In re F.R.*, 209 Ill. App. 3d at 279-80.

¶ 39    Similarly, in *People v. Ocampo*, 377 Ill. App. 3d 150, 161-62 (2007), where the officer did not testify about his knowledge of the area, we held that the officer lacked the reasonable suspicion for a stop. In *Ocampo*, the officer testified that he observed the driver of a vehicle talk on his cellular telephone and that he observed defendant then emerge from behind a gas station, tap on the trunk, enter the vehicle, and engage in a short conversation with the driver, during which defendant appeared to be taking something out of his pocket. *Ocampo*, 377 Ill. App. 3d at 161. The appellate court held that the officer's observations did not rise to the level of reasonable suspicion because the officer failed to testify either "that the area in question was a high-crime area or that police had any incriminating prior knowledge about either subject." *Ocampo*, 377 Ill. App. 3d at 161. If the officer in *Ocampo* had testified about his "knowledge," then the stop would have been upheld.

¶ 40    The case at bar has what *Ocampo* lacked: testimony by the officer about his knowledge. Here, the officer testified that he knew that the area was a high-crime area and, like in *F.R.*, he explained how he knew that fact, namely, because he himself had made arrests there before for violent and drug-related crimes.

¶ 41    *People v. Surles*, 2011 IL App (1st) 100068, ¶ 39, is a post-*Harris* case and it also supports affirming in the case at bar. In *Surles*, as in our case, the police officer testified that the location in which he observed defendant was a high-crime area. *Surles*, 2011 IL App (1st) 100068, ¶ 10. However, unlike our case, in *Surles* the officer testified that defendant did nothing to make him nervous or afraid, and that the sole reason he placed defendant in handcuffs was because he " 'want[ed] to play everyone safe' " in a dangerous area. *Surles*, 2011 IL App (1st) 100068, ¶¶ 8, 10. As a result, the appellate court in *Surles* held that presence in a high-crime area, by itself, was insufficient to create reasonable suspicion, where the officers had no prior knowledge of defendant and where defendant's "conduct" was not unusual. *Surles*, 2011 IL App (1st) 100068, ¶ 40; *Mario T.*, 376 Ill. App. 3d at 476-77 (holding that the defendant's presence in a high-crime area was insufficient to arouse the officer's suspicion because she did not observe the defendant doing anything out of the ordinary or consistent with activity she had observed in making prior arrests at the location in question); *People v. Linley*, 388 Ill. App. 3d 747, 752 (2009) (finding no reasonable suspicion where defendant did nothing "unusual").

¶ 42    By contrast, in the case at bar, the officers had not only presence in a high-crime

-9-

neighborhood, but also bizarre conduct by defendant, as discussed below. *Wardlow*, 528 U.S. at 124 ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). As a result, the *Surles* holding supports the conclusion that we reach today.

¶ 43    Thus, we conclude, first, that the officer's undisputed and uncontradicted testimony, which was accepted as credible by the trial court, was sufficient to establish that the area was, in fact, a high-violence and a high-narcotics trafficking area. Second, we find that, even if more was required, it was present in this case, since the officer testified about his knowledge of the area, specifically that he had made arrests in this area for these types of crimes before.

¶ 44    Most importantly, in the case at bar, no one present in the courtroom thought to question the police officer's statement. The defendant, the defense counsel, the prosecutor and the trial judge, who were all familiar with local conditions, were present in the courtroom and listening to the police officer's testimony that this area was a high-crime area, and yet no one in the room thought to question this statement. We observe that the trial judge is an experienced criminal law judge in Chicago who would recognize immediately the neighborhood about which the officer was testifying. The question then becomes whether a more distant appellate court, that is reading a cold transcript, should simply substitute its judgment for that of a local and experienced trial judge concerning a purely factual issue. We hold that is not appropriate.

¶ 45                            V. Defendant's Bizarre Behavior

¶ 46    Next, defendant claims that his conduct was not suspicious. Defendant claims that he was simply standing on a street corner while the trial court found that his behavior was "erratic." We hold that the trial court's factual finding was not against the weight of the evidence and that this finding supports the trial court's legal conclusion that the stop was justified.

¶ 47    In *People v. Morales*, 221 Ill. App. 3d 13, 17 (1991), the appellate court upheld a *Terry* stop that was based upon the behavior of defendant. In *Morales*, the responding police officer testified that he observed defendant and another person approach each other and "appear to exchange something." *Morales*, 221 Ill. App. 3d at 15. The officer testified that he did not observe any drugs or money change hands, but he did characterize defendant's behavior as " 'drug-type action.' " *Morales*, 221 Ill. App. 3d at 15. The officer shined his light on the two men, and they walked away in different directions. *Morales*, 221 Ill. App. 3d at 15. Defendant cupped his hands as he walked away. *Morales*, 221 Ill. App. 3d at 15. The officer and his partner pursued defendant in their squad vehicle because the officer believed that defendant had made a drug sale or purchase. *Morales*, 221 Ill. App. 3d at 15. The appellate court determined that the facts known to the officer, namely, that defendant was holding his hands in a cupped manner, that defendant and the other individual exhibited "drug-type action," and that the two men separated when the officers arrived, were sufficient to create a reasonable suspicion in the officer that defendant had committed or was about to commit a crime. *Morales*, 221 Ill. App. 3d at 17.

¶ 48    In the case at bar, defendant's behavior was also suspicious, although in a different way. As the officers approached, defendant started flailing his arms about and pointing, and moving backward and spouting words that the officers could not understand, before the

officers even asked a question. When the officers asked him to place his hands on the vehicle, defendant placed his hands on the vehicle and then took them off–repeatedly–on and off.

¶ 49     Defendant's conduct appeared to be more than simply standing on a corner to the officer who witnessed it, and to the trial court who listened to the officer's testimony firsthand. Officer Anderson testified that he noticed defendant watching the squad vehicle as it passed defendant a second time. When Officer Anderson and his partner exited their vehicle, defendant began speaking before either officer spoke a word. According to Officer Anderson, he could not "understand" anything defendant said. Officer Anderson described defendant's behavior as "erratic." Specifically, Officer Anderson testified that defendant "was moving his arms, flailing about, moving backwards," pointing, and "making all kinds of movements." When asked to place his hands on the police vehicle, defendant removed and placed his hands, back and forth, on the vehicle several times. The trial court found the officer's testimony credible and made a factual finding that defendant's behavior was "erratic." As stated above, we are not at liberty to substitute our factual opinions for those of the trial court that listened to the officer firsthand, and we may reverse the trial court's factual finding only if it is against the manifest weight of the evidence. *Close*, 238 Ill. 2d at 504; *Bunch*, 207 Ill. 2d at 13. In the case at bar, the transcript of the officer's testimony amply supports the trial court's factual findings.

¶ 50                                    VI. The Frisk

¶ 51     On this appeal, defendant challenges not only the initial stop but also the subsequent frisk. To justify a protective patdown, the State must demonstrate that "a reasonably prudent person, when faced with the circumstances that the police confronted, would have believed that his safety or the safety of others was in danger." *People v. Davis*, 352 Ill. App. 3d 576, 580 (2004). Since the record discloses bizarre behavior by defendant in a high-crime area, we find that the officers had a reasonable concern about their safety and the safety of others in their vicinity.

¶ 52     As a final matter, the State and defendant agree that the mittimus erroneously reflects convictions on each count of unlawful use of a weapon by a felon. The parties request the mittimus be corrected to reflect a single conviction and we do so order. Ill. S. Ct. R. 615(b)(1) (eff. Jan. 1, 1967).

¶ 53                                    CONCLUSION

¶ 54     For the reasons set forth above, we affirm the trial court's decision to deny defendant's motion to suppress evidence and order the mittimus corrected to reflect a single conviction.

¶ 55     Affirmed; mittimus corrected.

¶ 56     JUSTICE GARCIA, dissenting.

¶ 57     I cannot join the majority in affirming the circuit court's denial of the defendant's motion

contending his stop and frisk were illegal, which was heard with his bench trial. In my judgment, the officer's testimony, upon which the State solely relies to support the finding of reasonable suspicion and which the majority sets out above, amounts to no "more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity." (Internal quotation marks omitted.) *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000).

¶ 58    The testifying officer twice observed the defendant walking on a Chicago street. Apparently because the defendant continued to look at the officers as they traveled in their squad car, behavior that amounted to nothing more than the conduct the officers engaged in by observing the defendant, the officers circled the block to conduct a field interview of the defendant. The very observant defendant did not run as the officers approached. The only officer to testify stated that as he and his partner approached the defendant in their police car, the defendant was doing nothing more than "standing on the corner." Only after the officers exited their squad car did the defendant begin "to act a little erratic." But still the defendant did not run to prevent the officers from engaging in that "field interview." Yet, no field interview was ever conducted. According to the officer's testimony, it was the defendant that began to speak, "before [the officers] even asked any questions." The officer, however, did not testify to having interrupted the defendant to ask for his "name and address *** [or] an explanation of his actions" as the Illinois codification of the *Terry* standard permits. 725 ILCS 5/107-14 (West 2008). Rather, immediately upon reaching the defendant, the officers directed the defendant "to put his hands on the hood of the car" for "officer safety" reasons. According to the officer, the defendant did not fully comply: "He repeatedly put them on and [took] them off." The testifying officer observed the defendant "[p]ointing, flailing, [and making] all kinds of movements [with his arms]." The assistant State's Attorney then asked, "At that point when the defendant refused to keep his hands on the vehicle, what did you do?" The testifying officer candidly admitted, "We detained him." The officers "detained" the defendant by placing "his hands in cuffs." Before doing so, the officers removed the defendant's backpack. The testifying officer asserted that the area where the defendant was detained was a "high crime area."

¶ 59    The question before this court is whether those circumstances, as described by the testifying officer, justify the forcible detention of a Chicago resident with the use of handcuffs, before which his backpack was removed from his possession, following which the defendant's person and his backpack were frisked. I submit the United States and Illinois Constitutions protect all citizens from such unwarranted police conduct. "Even a limited search *** constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry*, 392 U.S. at 24-25. "[A frisk for weapons] is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly." *Id.* at 17.

¶ 60    As the majority makes clear, the State points to two factors–presence in a "high crime area" and the defendant's purportedly "bizzare" conduct–to argue that the officers acted with reasonable suspicion. Only if both factors are adequately supported by the evidence adduced during the proceedings below can the State prevail because each factor alone is insufficient to establish reasonable suspicion. "An individual's presence in an area of expected criminal

activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124. "Although nervous behavior can be a pertinent factor in determining reasonable suspicion [citation], nervousness alone does not justify a frisk ***." *People v. Davis*, 352 Ill. App. 3d 576, 581 (2004). As the United States Supreme Court cautioned in establishing the constitutionality of what is now known as a *Terry* stop, that determination "becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21. The factors asserted by the State, unsubstantiated by the evidence, support neither the stop nor the frisk.

¶ 61    According to the State, Officer Anderson's testimony provided sufficient detail to warrant a finding of fact that the location of the defendant's detention is a "high crime area." The full testimony of Officer Anderson on the issue of "high crime area" amounted to answers he gave to two questions, all of which I set out below.

"Q. And how would you describe the area that he was walking in?

A. It's a high violence, high narcotics trafficking area.

Q. Have you yourself made arrests in that area for those things before?

A. Yes, I have."

¶ 62    If we are to give meaning to this court's holding in *People v. Harris*, 2011 IL App (1st) 103382, ¶ 14, that "[a] conclusory and unsubstantiated statement that a location is a 'high crime area' is insufficient to establish that consideration for purposes of justifying a *Terry* stop," then the officer's answers in this case were insufficient to establish the "high crime area" factor. If all it takes is for the testifying officer to say he has made "arrests" in that area to transform his testimony to something more than a blanket claim of the location being in a "high crime area," then all residents of that community are afforded less constitutional protection than the residents of a community where police patrol less frequently. To accept as sufficient the officer's testimony in this case removes the substance from this court's decision in *Harris*.

¶ 63    In *Harris*, this court examined the sufficiency of an officer's testimony that the investigative stop occurred in a high crime area, against the backdrop of federal authority that cautioned against blanket acceptance of such testimony. See *United States v. Wright*, 485 F.3d 45, 53-54 (1st Cir. 2007) (in the context of rejecting the district court's "backward reasoning" from the recovery of a gun to reasonable suspicion, the federal court of appeals vacated the factual finding of a high crime area in the absence of any discussion by the district court of some combination of three considerations to establish such a finding as supported by the cited cases). In this case, the testimony of the officer is emblematic of the experience of the presiding judge in *Harris*: " 'I am waiting for the first block in Chicago that's not considered *** [a] high crime area.' " *Harris*, 2011 IL App (1st) 103382, ¶¶ 13-14; see *People v. Surles*, 2011 IL App (1st) 100068, ¶ 39 ("We join our brethren [in *Harris*] in rejecting such conclusory and self-serving statements, because they are overbroad and largely irrelevant, without some specific facts known to the police that tie defendant to the crime in

the area."); *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity.").

¶ 64    I submit that an officer's claim to have made arrests in the area of the *Terry* stop, whose boundaries he failed to provide, suggests nothing more than he is doing his job. See *People v. Davis*, 352 Ill. App. 3d 576, 580 (2004) (circuit court concluded that three or four arrests did not transform a location into a high crime area), *cf. People v. Lee*, 214 Ill. 2d 476, 486 (2005) ("[T]he fact, by itself, that the officers found defendant in a certain area, without any overt act by defendant, does not establish probable cause for warrantless arrest."). In fact, had the testifying officer not made "arrests" in the area of his patrol, setting aside the unknown time frame of when those arrests occurred, then it would call into question whether police resources were being effectively deployed.

¶ 65    The deficiency in the "high crime area" testimony of the officer is best illustrated by its contrast with the officer's testimony in *In re F.R.*, 209 Ill. App. 3d 274 (1991). In that case, the officer testified that the precise intersection where he observed the juvenile F.R. was "a known drug trafficking area and that he [had] observed drug transactions occurring at that intersection approximately 25 times." *Id.* at 275-76. The officer also testified "that in the six months before the hearing, he had made about a dozen arrests there." *Id.* at 276. We upheld the finding by the presiding judge in *F.R.* that a lawful *Terry* stop occurred because in addition to other observations, it was supported by the "high crime area" factor as the officer's testimony plainly established. "In light of the fact that, from [the testifying officer's] experience, he knew drug transactions occurred at this corner with juveniles walking up to parked cars, the events of this case could lead him to reasonably suspect that the respondent was committing or was about to commit a crime." *Id.* at 280. By contrast, the testimony elicited by the State in the instant case provided no objective basis for the presiding judge to echo the officer's testimony that the location of the defendant's stop and frisk was a high crime area. While a finding of fact by the circuit court is entitled to deference, "this deference does not require a mindless rubber stamp." *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000).

¶ 66    I also find the characterization of the defendant's behavior as described by the officer as "a little erratic" because the defendant "began speaking before we even asked any questions, moving his arms, flailing about, moving backwards," offers little to meet the State's burden that reasonable suspicion of criminal activity was present. *Wardlow*, 528 U.S. at 123-24. The officer failed to articulate any suspicion of criminal activity that attached to the defendant's behavior. See *People v. Smith*, 331 Ill. App. 3d 1049, 1054-55 (2002) (defendant's behavior of backing away from officers and refusing to remove hands from pockets did not justify a *Terry* stop). Nor do I accept the State's premise that the defendant's unwillingness to, in effect, *assume the position* by placing his hands on the hood of the police car can serve to justify the forcible detention of the defendant. That the defendant repeatedly removed his hands from the police car and pointed and flailed his arms suggests nothing more than a protest of the officers' conduct. It was the State's burden to demonstrate the officers had articulable suspicion of criminal conduct before they could lawfully command that the

defendant do as they directed. "The conduct constituting the stop under *Terry* must have been justified at its inception." *People v. Thomas*, 198 Ill. 2d 103, 109 (2001).

¶ 67 Importantly, the State makes no claim that the observed behavior of the defendant was evasive or suggested possible flight. It does contend, however, that the defendant's conduct, which it characterizes as "bizarre" because it purportedly lacked adequate explanation, justified the stop and frisk by the officers. The State summarizes the situation confronting the officers: "[T]here was something not quite right with defendant and the officer had every reason to believe that defendant was armed and a danger to the officer and the public at large." That the defendant was "moving backward" when he was aggressively confronted by police is hardly conduct suggesting criminal activity afoot to warrant a forcible detention. See *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (plurality op.) ("We have expressly identified this 'right to remove from one place to another according to inclination' as 'an attribute of personal liberty' protected by the Constitution." (quoting *Williams v. Fears*, 179 U.S. 270, 274 (1900))); *Smith*, 331 Ill. App. 3d at 1054-55 (defendant's behavior of backing away from officers and refusing to remove hands from pockets did not justify a *Terry* stop).

¶ 68 Nor does the Supreme Court's decision in *Wardlow* offer any support for the State's position in this case. The focus of the *Wardlow* decision centered on the significance of flight as a factor in assessing reasonable suspicion under the totality of the circumstances.[1] As made clear by the record in this case, while the defendant presumably could have run, he never did. Notably, the State presents this court with no case that upheld a *Terry* stop and frisk with facts similar to those of the instant case where no flight occurred. *Wardlow* certainly is not such a case and numerous appellate court decisions have held that unusual behavior by a citizen upon being approached by an officer does not, in and of itself, suggest that criminal activity is afoot. See, *e.g.*, *People v. Linley*, 388 Ill. App. 3d 747, 748 (2009) (observation by officer that "it appeared as if [defendant] was considering to run" because he was "backing away from the truck" and displayed "suggestive body language" did not justify an investigative stop, even when the area is known for frequent criminal activity (internal quotation marks omitted)); *Davis*, 352 Ill. App. 3d at 581 ("defendant's nervousness did not create a reasonable belief that he was armed and dangerous"); *People v. Thompson*, 337 Ill. App. 3d 849, 855 (2003) ("Nervousness on the part of a defendant when a police officer approaches is not enough to create a reasonable suspicion of criminal activity."); *Smith*, 331 Ill. App. 3d at 1054-55 (defendant's behavior of backing away from officers and refusing to remove hands from pockets did not justify a *Terry* stop); *People v. Simac*, 321 Ill. App. 3d 1001, 1003 (2001) (officer's testimony that the defendant made "furtive" movements and "odd movements toward the passenger seat" and that the officer had to ask the defendant several times to stand on the sidewalk before he complied all failed to support the State's claim of reasonable suspicion of criminal activity). In fact, the concern expressed

---

[1]In fact, the dissent in *Wardlow* noted that the State of Illinois requested the Court "announce a 'bright-line rule' authorizing the temporary detention of anyone who flees at the mere sight of a police officer." *Wardlow*, 528 U.S. at 126 (Stevens, J., concurring in part and dissenting in part, joined by Souter, Ginsburg, and Breyer, JJ.). Had such a *per se* rule been announced, it would have no application to the facts of this case.

by one court resonates here: "In our view, the fourth amendment protections of personal security and freedom would be severely undermined if the police were permitted to stop those individuals whose behavior was deemed to be of an 'unusual' nature rather than a criminal one." *People v. Dionesotes*, 235 Ill. App. 3d 967, 970 (1992). The testifying officer was never asked by the State to articulate what about the defendant's conduct caused him to suspect criminal activity.

¶ 69    Ultimately, the majority's decision lowers the bar set by *Terry* for police-citizen encounters in Illinois. Should an officer deem a citizen to act a "little erratic" or too nervous and should the officer have made prior arrests in the area to permit his or her testimony that the stop occurred in a "high crime area," forcible detention may follow when the citizen acts in any way that falls short of full compliance with the officer's directions, even when there is little to justify the commands of the officer that the citizen place his hands on the hood of the squad car. Under the authority of this case, a citizen now may be lawfully handcuffed and his person and separate possessions patted down without an objective showing that reasonable articulable suspicion of criminal activity exists and, further, that the officer reasonably believed the citizen to be armed and dangerous, which numerous other decisions of this court have made clear is required under our constitutions.

¶ 70    In sum, under my view of the facts of this case, the stop of the defendant was unsupported by reasonable suspicion of criminal activity based on the two factors asserted by the State. The State's high crime showing in this case, which amounted to two simple statements by the testifying officer, failed to establish that the location where the defendant was stopped and frisked was a high crime area such that it could properly be considered for purposes of justifying a *Terry* stop. *Harris*, 2011 IL App (1st) 103382, ¶ 14. The perceived bizarre conduct of the defendant did not permit the officer to frisk the defendant for "officer safety" when no objective showing was made that the defendant was armed and dangerous. *Terry*, 392 U.S. at 21. In other words, the testifying officer did not articulate "any specific fact which would have led a reasonably prudent person in the circumstances to have been 'warranted in the belief that his safety or that of others was in danger.' [Citations.]" *People v. Galvin*, 127 Ill. 2d 153, 174 (1989) (quoting *Terry*, 392 U.S. at 27); see *F.R.*, 209 Ill. App. 3d at 279 (though the *Terry* stop was justified, the frisk was not, where "[t]he record [was] devoid of any *other facts* which would provide a basis to reasonably invoke a protective search" (emphasis added)); *Davis*, 352 Ill. App. 3d at 581 ("defendant's nervousness did not create a reasonable belief that he was armed and dangerous"). Neither the stop nor the frisk was justified under the facts of this case. "Under *Terry*, the question of whether a stop is valid is a distinct and separate inquiry from whether a frisk is valid." *Galvin*, 127 Ill. 2d at 163; compare 725 ILCS 5/107-14 (West 2008) (showing required for a *Terry* stop), with 725 ILCS 5/108-1.01 (West 2008) (a *Terry* frisk may be performed when an officer "reasonably suspects that he or another is in danger of attack").