2023 IL App (1st) 211649-U

No. 1-21-1649

Order filed November 2, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 6246 |
| | ) | |
| JOSE MARTINEZ, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court erred in denying defendant's motion to suppress evidence of a firearm, where a police officer's mere observation of a "bulge" in defendant's pocket did not support a reasonable, articulable suspicion that criminal activity was afoot to justify a stop and search of defendant's person. We reverse defendant's conviction of unlawful use or possession of a weapon by a felon and his sentence.

¶ 2   Following a bench trial, defendant Jose Martinez was found guilty of unlawful use or possession of a weapon by a felon (UUWF) and sentenced to seven years in prison. On appeal, defendant argues the trial court erred in denying his motion to suppress evidence of the firearm

recovered from his person, where the arresting officer lacked the requisite reasonable, articulable suspicion that criminal activity may be afoot to stop and search him. We agree with defendant and reverse his conviction and sentence.

¶ 3     Defendant was charged by indictment with one count of armed habitual criminal, two counts of UUWF, and three counts of aggravated unlawful use of a weapon, premised on an incident in Chicago on April 7, 2021. The State proceeded on one count of UUWF (720 ILCS 5/24-1.1(a) (West 2020)) and nol-prossed the remaining counts.

¶ 4     Prior to trial, defendant filed a motion requesting that the trial court suppress all evidence recovered from him, in particular a firearm, because the arresting police officers lacked the legal authority to arrest him, search him, and seize the firearm from his person. The trial court held a combined hearing on defendant's motion to suppress and a bench trial.

¶ 5     Chicago police officer Carreon testified that, at the time of the proceeding, he had been working with the Chicago Police Department for about six years.[1] On April 7, 2021, at about 10:15 p.m., he and his partner Officer Smalec were on patrol in uniform in an unmarked vehicle near the 2500 block of South Christiana Avenue. Smalec was driving the vehicle southbound. From the passenger's seat, Carreon saw two men walking northbound on a "well-lit" sidewalk. Carreon's view was aided by his flashlight.

¶ 6     From "[m]aybe less than a car's length away," Carreon observed that one of the men, identified in court as defendant, had a "large bulge" in his "pant pocket" causing the "right pocket side of the jacket to be weighed down heavily." Based on his observations, Carreon "exited the

---

[1] The first names of Officer Carreon and his partner Officer Smalec do not appear in the transcript of the trial proceedings.

vehicle and approached, conducted an investigatory stop, believing that [defendant] might be concealing a firearm in that pocket." Carreon testified that,

> "upon approach, I asked about the – the heavy weighted object in [defendant's] pocket. He pointed at it and [*sic*] conducted a protective pat-down of that pocket. Once I -- once I became aware that the object in the pocket resembled a firearm, was a heavy metal object, at that point, he was detained."

¶ 7 Carreon testified that he was equipped with a body-worn camera on the date in question. The State, and subsequently the defense, published the footage from Carreon's body-worn camera in court. The footage was entered into evidence and is included in the record on appeal. We have viewed the footage. There is no audio to the video recording until approximately the 0:20 second timestamp mark.

¶ 8 In the body-worn camera footage, Carreon is seen exiting the police vehicle at about the 0:03 second timestamp mark. As Carreon is walking, he shines his flashlight on defendant and another man, who are walking on a sidewalk at night. Defendant is wearing a black jacket, and his right hand appears to be slightly raised near the right pocket of his jacket. The other man with defendant is wearing a red hooded sweatshirt and raising his hands in the air as soon as he looks in Carreon's direction.

¶ 9 As Carreon quickly approaches the two men, defendant also begins to raise his hands to just above waist-height and slowly turns toward Carreon so that a bulge in the right side of his jacket can be seen. The right side is weighed down slightly below the left side of the jacket. At about the 0:09 second timestamp mark, Carreon takes hold of defendant's right hand with his left hand and, at the 0:10 second timestamp mark, takes hold of the left side of defendant's jacket and

opens it. At about the 0:17 second timestamp mark, Carreon takes hold of defendant's left arm, and his partner takes hold of defendant's right arm. The officers walk defendant toward their vehicle. At about the 0:19 second timestamp mark, the officers begin handcuffing defendant's hands behind his back as defendant is pressed against the police vehicle. The video footage has no audio until defendant is handcuffed at approximately the 0:20 second timestamp mark, so it is not clear whether any words were exchanged between Carreon and defendant prior to defendant being handcuffed. At about the 0:31 second timestamp mark, Carreon removes a firearm from defendant's right jacket pocket, and the video clip ends.

¶ 10     After the video evidence was played, Carreon confirmed that he recovered the firearm from defendant's right side jacket pocket and stated that defendant was detained at that point. Carreon testified that defendant was asked whether he had a firearm owners identification (FOID) card or concealed carry license, and defendant relayed that he had a concealed carry license, but it may be suspended. After running a name check at the scene, no FOID card or concealed carry license "came up." Defendant was then placed into custody. The State entered into evidence the firearm recovered from defendant, as well as a magazine that was recovered from inside the firearm, and the ammunition inside the magazine.

¶ 11     On cross-examination, Carreon testified that he was not aware of an outstanding search or arrest warrant for defendant. When first seen, defendant did not have his hand in his pocket. Carreon was shown a still image from his body-worn camera, and he confirmed that defendant's right hand was visible in the picture. Carreon confirmed that, while sitting in the vehicle, he noticed the "extremely large" bulge in the right side pocket of defendant's jacket but did not see the butt of a firearm. As he approached defendant on foot, Carreon observed what he "believed" to be the

barrel of a firearm in defendant's pocket, but did not see any metal. Defendant did not try to run away or attempt to discard the firearm, and his arm was never outstretched toward Carreon or up in the air above his shoulders.

¶ 12     Carreon testified that when he reached defendant, he conducted a patdown of that right side pocket and felt what turned out to be a firearm. Carreon confirmed that defendant was not free to leave once Carreon conducted the pat down, but stated defendant "was not detained when [Carreon] was approaching him." Carreon confirmed that he did not ask defendant if he had a FOID card or concealed carry license until defendant was handcuffed and "detained" outside the vehicle. Carreon denied that he searches "everybody with an extremely large bulge in their coat."

¶ 13     In closing, defendant's counsel argued that the officers lacked a reasonable suspicion to approach and patdown defendant, and they lacked probable cause to arrest him. He asserted that "at best" the officers stopped him on "a hunch," and, "at worst," the stop was "pretextual." Defendant argued Carreon "saw two Hispanic men walking on the street, and he immediately *** did a pat-down."

¶ 14     Defendant's counsel recounted that while the officers were in a moving vehicle, Carreon saw defendant wearing a dark jacket in the evening. Defendant did not run or "take any actions" that made him a threat to the officers. Nonetheless, Carreon "jumped out of that car and *** immediately beelined for [defendant]." Defendant further argued that the "imprint of a barrel" could have looked similar to the rectangular imprint of a phone or stapler, and Carreon could not have seen any imprint as defendant had his hand by his pocket, "if not in his pocket." He further asserted that the observation of a firearm was not itself evidence of a crime, and the officers improperly arrested defendant first and then determined licensure later, which is no longer legal.

Defendant therefore asked that the court grant his motion to suppress or, alternatively, find him not guilty.

¶ 15    The State argued that the court should deny defendant's motion to suppress, because there were "no statutory constitutional violations," and find him guilty. The State asserted the trial court had the "entire encounter" on video, so "this isn't speculative, we're not dealing with hypotheticals, we're not dealing with what if situations." It argued that Carreon observed defendant's coat "was weighed down, not by a light object, not by a large object, but by a heavy object." The officers then "detained [defendant], removed the firearm and *** placed him into custody after they conducted an investigation and it was found out that the Defendant did not have a valid FOID or Concealed Carry license."

¶ 16    The trial court denied defendant's motion to suppress and found him guilty of UUWF. The court noted Carreon's testimony that he saw defendant "walking with a heavy object in his pocket." As Carreon approached, he observed "the outline of a barrel in that pocket" and then detained him. The court found "[t]here certainly is enough for a *Terry* stop there." The court then stated Carreon "conducted a further investigation, and retrieved a weapon, and then *** asked [defendant] whether he had a Concealed Carry." Defendant responded he did, but "that was later found out to be not true, and then [Carreon] placed him under arrest." The court concluded that there was sufficient basis to initiate a *Terry* stop, and "that the further investigation led to probable cause."

¶ 17    Defendant filed a motion to set aside the guilty finding or, in the alternative, for a new trial, asserting that the trial court erred in denying his motion to suppress, and that the State failed to prove him guilty beyond a reasonable doubt.

¶ 18    At a hearing on the motion, defendant reiterated his prior argument and added that Carreon did not ask if defendant had a license to carry the firearm until after defendant was handcuffed by the police vehicle. He asserted that the large bulge did not justify an investigatory stop because "anything could create a large bulge in a coat," and defendant was detained when Carreon "jumped out of the car." The State argued that the body-worn camera footage "clearly showed an L-shaped object" weighing down defendant's coat. It stated that the court had the opportunity to judge the officers' credibility and look at the evidence, and its findings should not be disturbed.

¶ 19    The trial court denied defendant's motion. Noting defendant was eligible for Class X sentencing, the court sentenced him to seven years in prison for UUWF.

¶ 20    On appeal, defendant argues the trial court erred in denying his motion to suppress the firearm recovered from his person, where he was subjected to a detention and search that violated the fourth amendment. He claims that Officer Carreon lacked any articulable basis to believe that he had or was committing a criminal offense because walking on the street with a bulging pocket was not a viable reason to stop or search him.

¶ 21    A defendant filing a motion to suppress evidence bears the burden of making a "*prima facie* case that the evidence was obtained by an illegal search or seizure." *People v. Brooks*, 2017 IL 121413, ¶ 22. When reviewing a trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Under that standard, we review the trial court's findings of historical fact for clear error, giving "great deference" to the court's factual findings and reversing them only if against the manifest weight of evidence. *Id.* We review *de novo* the court's ultimate legal determination on whether suppression is warranted. *Id.*

¶ 22    The fourth amendment to the United States Constitution, and the Illinois Constitution, guarantee the "right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31 (citing U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). However, " '[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, *** certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' " *People v. Jones*, 215 Ill. 2d 261, 269 (2005) (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)).

¶ 23    "For purposes of the fourth amendment, an individual is seized when an officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen." (Internal quotation marks omitted.) *Luedemann*, 222 Ill. 2d at 550. "It is well settled that not every encounter between the police and a private citizen results in a seizure." *Id.* ¶ 544. Courts have categorized police-citizen encounters into three tiers: (1) the arrest of a citizen, which must be supported by probable cause; (2) a "temporary investigative seizure," or *Terry* stop, conducted pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) a consensual encounter, which involves "no coercion or detention" and thus implicates no fourth amendment interests. *People v. McDonough*, 239 Ill. 2d 260, 268 (2010).

¶ 24    Under *Terry*, " 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ***,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*,

392 U.S. at 30). In order to properly conduct a *Terry* stop, "[t]he officer must have a reasonable, articulable suspicion that criminal activity is afoot." (Internal quotation marks omitted.) *People v. Timmsen*, 2016 IL 118181, ¶ 9. Though this standard is "less demanding" than the probable cause standard, "an officer's suspicion must amount to more than an inchoate and unparticularized suspicion or hunch of criminal activity." (Internal quotation marks omitted.) *Id.*

¶ 25     The decision to make an investigatory stop is based on the totality of the circumstances. *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 14. "The investigatory stop must be justified at its inception, and the officer must be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Edwards*, 2020 IL App (1st) 182245, ¶ 24 (citing *People v. Close*, 238 Ill. 2d 497, 505 (2010)). A finding of reasonable suspicion "must be based on commonsense judgments and inferences about human behavior, and due weight must be given to the reasonable inferences the officer is entitled to draw from the facts in light of his experience." *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 19.

¶ 26     We find that defendant was subjected to an unlawful stop under *Terry* principles. The initial encounter was not, as the State urges, a "field interview" akin to a consensual encounter. Rather, it was a seizure.

¶ 27     The video evidence reflects that Carreon exited the police vehicle while in his uniform (0:03 second timestamp mark) and rapidly approached defendant and the other man while shining his flashlight on them. Within 6 seconds after leaving his vehicle, Carreon had his hand on defendant (0:09 second timestamp mark). "[A] person has been seized when, considering the totality of the circumstances, a reasonable person would believe he is not free to leave." *People v. Almond*, 2015 IL 113817, ¶ 57. When someone is approached at night by a fast-moving, uniformed

police officer shining a light on them, the person would reasonably believe they are not free to leave when faced with this show of authority. See *Luedemann*, 222 Ill. 2d at 550 (an individual is "seized" for purposes of the fourth amendment when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen).

¶ 28    Indeed, the video shows that defendant and the other man stop immediately as Carreon approaches. The other man raises his hands into the air while defendant begins to raise his hands. As such, a seizure occurred during this initial encounter, as defendant and the other man reasonably would have believed they were not free to leave. *Id.* The conclusion that the initial encounter was a seizure rather than consensual is reinforced by Carreon's testimony that, based on his observations of defendant walking at night with a large bulge in his pocket, Carreon "exited the vehicle and approached, conducted an investigatory *stop*." (Emphasis added.)

¶ 29    We thus turn to whether that seizure was reasonable. We find that it was not.

¶ 30    In *People v. Lozano*, 2023 IL 128609, our supreme court recently held that, where police officers saw the defendant running in the rain "holding the front of his sweatshirt," which had a "large bulge," the officers lacked reasonable suspicion to stop and frisk the defendant to " 'see what was the bulge.' " *Id.* ¶¶ 37-40. The court noted that, based on the testifying officer's testimony, the officers were not responding to a particular report of crime in the area when they happened upon the defendant, and neither officer stated that the neighborhood was a high-crime area. *Id.* ¶ 39. Further, the defendant had been running from the first moment the officers saw him, *i.e.*, his continued running could not be seen as unprovoked flight from the officers. *Id.* Lastly, the testifying officer "did not testify that defendant's conduct conformed with his knowledge of

criminal activity. He simply wanted to know why defendant was running and what item caused a bulge in defendant's pocket." *Id.*

¶ 31    There was even less evidence supporting reasonable suspicion in the case at bar. The basis for Officer Carreon's seizure of defendant was that he saw a large bulge in defendant's coat pocket that weighed his coat down slightly as defendant and another man walked down a well-lit sidewalk at about 10:15 p.m. This was the sole reason that the uniformed Carreon rapidly approached the men and shone his flashlight on them. The men were not walking fast, and there was no testimony that the officers were in a high crime area or responding to the report of a crime. The video shows that, within 6 seconds of exiting the vehicle and approaching defendant by the sidewalk, Carreon had already placed his hand on defendant.

¶ 32    Carreon offered no observations to support a reasonable, articulable suspicion that criminal activity was afoot to justify the initial seizure of defendant. See *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 31 ("There is nothing criminally suspicious about walking down the street with one's hands in one's pockets," and "[p]utting something in one's pockets *** is not a hallmark of criminal activity"). For example, Carreon did not offer testimony that defendant had engaged in any unusual behavior or furtive movements from which it was reasonable to infer that defendant unlawfully possessed whatever was in his pocket or that he was planning a crime. See *People v. Jenkins*, 2021 IL App (1st) 200458, ¶¶ 45-46. Moreover, as this court has noted, even had Carreon suspected that the bulge in defendant's pocket was a firearm, "police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity." *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40. Therefore, given the absence of any reasonable, articulable suspicion that criminal activity was afoot, defendant was unlawfully stopped upon his

initial encounter with Carreon. See *Lozano*, 2023 IL 128609, ¶¶ 37-40; see also *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶¶ 32-33 (officer lacked reasonable suspicion where the defendant only walked away from the officer with his hands in his pockets).

¶ 33 The State argues that the "consensual encounter evolved into a *Terry* stop when Officer Carreon observed the imprint of the barrel of a firearm in defendant's pocket," but fails to explain how the mere observation of defendant with a bulge in his pocket supported a reasonable, articulable suspicion that criminal activity was afoot, in the first place. Accordingly, the stop of defendant was unlawful under *Terry* given the absence of a reasonable, articulable suspicion that criminal activity was afoot.

¶ 34 The State argues that Carreon was justified in conducting a protective patdown of defendant in order to assure the officers' safety, as Carreon believed that defendant was carrying a firearm. It is not clear from the record when Carreon believed the bulge in defendant's pocket resembled a firearm, as Carreon's testimony on the subject changed multiple times. On direct examination, he testified that he patted defendant down and, once he "became aware that the object in the pocket *resembled* a firearm," detained defendant. (Emphasis added.) At yet another point, he testified that he initially exited his vehicle because, based on the bulge, defendant "might be" concealing a firearm. On cross-examination, he stated that, as he approached defendant on foot, he saw the bulge and "believed" it resembled a firearm. Ultimately, the trial court found that Carreon believed defendant possessed a firearm at the time he approached defendant and subsequently performed a patdown. See *Luedemann*, 222 Ill. 2d at 542 (in reviewing the court's findings at a suppression hearing, this court must give "great deference" to the trial court's findings). Indeed, after performing a valid stop, an officer is justified in performing a protective

patdown where the officer reasonably believes the defendant is armed and dangerous. See *Jackson*, 2012 IL App (1st) 103300, ¶ 19 ("a protective patdown of a properly detained citizen for possible weapons" conducted after a stop has been initiated is justified where the officer had "a reasonable belief that the defendant was armed and dangerous"). However, "the right to perform a protective search presupposes the right to make the stop," and "[t]he police may only perform a protective search if they are entitled to stop the person in the first place." *People v. Harris*, 2011 IL App (1st) 103382, ¶ 17.

¶ 35    In this case, because Carreon lacked a reasonable, articulable suspicion that criminal activity was afoot to lawfully seize defendant, he also could not have lawfully performed a protective patdown pursuant to *Terry*. See *People v. Davis*, 352 Ill. App. 3d 576, 580 (2004) ("In order for a frisk to be constitutionally reasonable, (1) the stop must be proper, (2) the officer must have reason to know that the defendant is armed and dangerous, and (3) the scope of the search must be strictly limited to a search for weapons."). Moreover, the subsequent patdown and recovery of the firearm could not serve as a basis to justify the initial encounter. See *People v. Flowers*, 179 Ill. 2d 257, 263 (1997) (justification for a search under *Terry* is for protection and "not to gather evidence"). Accordingly, the ensuing patdown of defendant exceeded the lawful bounds of *Terry*. And in this case as in *Lozano*, where the improper stop and search took place "in moments," there were no intervening circumstances which removed the taint from the original illegality. *Lozano*, , 2023 IL 128609, ¶ 46. The recovered firearm was subject to suppression as the "fruit of the poisonous tree." *Id.*

¶ 36    We therefore conclude the trial court erred in denying defendant's motion to suppress the firearm recovered from his person following an unlawful stop and patdown under *Terry*. Because

the State cannot prevail on remand without the suppressed evidence, we reverse defendant's conviction and sentence." *Id*. ¶¶ 47-49 (reversing the defendant's convictions outright where the trial court erred in denying the defendant's motion to suppress evidence).

¶ 37    For the foregoing reasons, we reverse defendant's conviction and sentence.

¶ 38    Reversed.