# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. McCauley*, 2013 IL App (4th) 110103

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LIAM J. McCAULEY, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-0103 |
| Filed | February 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Based on the testimony of three psychiatrists and many lay witnesses as to defendant's sanity at the time he struck and stabbed his father, the trial court's findings that defendant's use of cannabis and LSD shortly before the killing triggered his latent mental illness and that he was guilty of murder, but mentally ill, were not against the manifest weight of the evidence, and furthermore, the imposition of a 27-year prison term was not an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 09-CF-756; the Hon. Robert L. Freitag, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, Karen Munoz, and Nancy L. Vincent, all of State Appellate Defender's Office, of Springfield, for appellant.

Ronald C. Dozier, State's Attorney, of Bloomington (Patrick Delfino, Robert J. Biderman, and Luke McNeill, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justices Appleton and Turner concurred in the judgment and opinion.

## OPINION

¶ 1    Following a July 2010 bench trial, the trial court found defendant, Liam J. McCauley, guilty but mentally ill of first degree murder (720 ILCS 5/6-2(c), 9-1 (West 2008)). In September 2010, the court sentenced defendant to 27 years in prison.

¶ 2    Defendant appeals, arguing that the trial court erred by finding him guilty but mentally ill of first degree murder because he did not meet the statutory definition of "voluntary intoxication" and he had proved that he was insane at the time of the murder. Alternatively, defendant argues that the trial court erred by (1) failing to *sua sponte* find him guilty of the lesser-mitigated offense of second degree murder and (2) imposing an excessive sentence. We affirm.

¶ 3                    I. BACKGROUND

¶ 4    In August 2009, the State charged defendant with first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2008)), alleging that he killed his father, Joseph McCauley, by striking him in the head with a bat and stabbing him in the back with a knife. Defendant thereafter waived his right to a jury trial. In July 2010, defendant's bench trial commenced, at which defendant argued that he was not guilty by reason of insanity.

¶ 5                 A. The State's Case in Chief

¶ 6    The State presented the following evidence through testimony from police officers, investigators, an emergency room doctor, as well as pathology and blood experts to prove that defendant murdered his father.

¶ 7                 1. *Officer Abigail Kern*

¶ 8    Officer Abigail Kern testified that, while working as a 9-1-1 operator, she received a call from defendant. The State thereafter played a recording of that call in open court. That recording, and the accompanying transcript, revealed that defendant reported killing his

father by hitting him with a baseball bat and stabbing him because he believed that his father was trying to rape him.

¶ 9                              2. *Officer Jeff Wernsman*

¶ 10    Officer Jeff Wernsman responded to the McCauley residence where defendant answered the door with a "blank look on his face"; defendant appeared to him to be "in shock." Wernsman explained that he located the victim, Joseph McCauley, in a bedroom, where he found a knife sticking out of his back, "blood splatters everywhere."

¶ 11                             3. *Sergeant Brian Brown*

¶ 12    Sergeant Brian Brown responded to the 9-1-1 call with Wernsman and agreed with Wernsman's observations that (1) defendant appeared to be in shock and (2) the victim was saturated in blood, a knife stuck in his back.

¶ 13                          4. *Professor Jane Camp Bartelmay*

¶ 14    Heartland Community College Professor Jane Camp Bartelmay worked with Joseph McCauley at the college. She observed him interact with his children, particularly defendant, and noted that Joseph was a good father. She added that Joseph and defendant had a close, loving father-son relationship.

¶ 15                              5. *Dr. Scott Denton*

¶ 16    Dr. Scott Denton, a coroner's forensic pathologist, conducted the autopsy on Joseph McCauley. Denton explained that Joseph (1) had suffered from blunt force trauma to the head with enough force to cause lacerations and a skull fracture, (2) had been stabbed in the back numerous times (45 wounds), and (3) had "defensive wounds" to his forearm and hand. Denton opined that Joseph died from the blunt force trauma and stab wounds, as they resulted in extensive blood loss. Denton added that Joseph's head injuries had been inflicted while he was sitting upright.

¶ 17                              6. *Officer Erik Yamada*

¶ 18    Officer Erik Yamada placed defendant in his squad car, he observed that defendant appeared "scared." On the way to the squad car, defendant mentioned that his father had molested him. Yamada added that once defendant was in the squad car he seemed more "panicked" and repeated that his father molested him, noting that his "butt was sore."

¶ 19                          7. *Detective Michael Johnson*

¶ 20    Detective Michael Johnson interviewed defendant at the police station. Johnson explained that defendant did not appear to have any visible injuries but complained that he had "pain in his rectum" and that he had been assaulted. Johnson thereafter transported defendant to the hospital for treatment. Defendant explained to the medical staff that he had

"leakage" from his anus and problems peeing and that he believed his father was going to assault him.

### 8. *Detective Dan Donath*

Detective Dan Donath was present during defendant's interview at the police station and did not notice any visible injuries to defendant. Donath also explained that he inspected the crime scene and noted that the scene included significant blood spatter. Donath further noted that he sent a sample of defendant's blood to the State Police laboratory to be tested for lysergic acid diethylamide (LSD), and the results of that test were negative.

### 9. *Detective Scott Mathewson*

Detective Scott Mathewson was assigned to the crime scene. Mathewson explained that during his initial "walk-through," he observed a baseball bat lying on the floor in the dining room. The bat appeared to have blood spatter on it.

### 10. *Dr. April Miller*

Dr. April Miller, the emergency room doctor who treated defendant, testified that defendant complained of "rectal pain," claiming that the pain was an "8" on a scale of "1-to-10." Miller noted that defendant seemed calm and responsive, watching television and smiling. She said that defendant seemed to her to be "acting fairly normally." Miller explained that defendant complained about sexual abuse but could not recount specific incidents. On the issue of Miller's physical examination of defendant, the following colloquy occurred:

> "[PROSECUTOR:] Okay, Based on this description of his symptoms and the reason for his symptoms, what did you do?
>
> [MILLER:] In addition to the physical exam, I did a focused rectal exam.
>
> [PROSECUTOR:] Can you tell me what you do in a focus rectal exam?
>
> [MILLER:] I would do an external exam, looking for any skin abnormality or signs of trauma, such as, scrapes, cuts, bruises, or signs of infection, and then a digital rectal exam where I evaluate for his sphincter tone and rectal tone.
>
> [PROSECUTOR:] What were you[r] findings after performing an exam on this patient?
>
> [MILLER:] Perhaps a small hemorrhoid, otherwise unremarkable.
>
> [PROSECUTOR:] What do you mean by unremarkable?
>
> [MILLER:] No obvious signs of trauma. Sphincter tone was normal. No discharge or signs of infection."

Miller added that she found no obvious signs of trauma after performing a sexual assault exam of defendant.

### 11. *Detective Shawn Campbell*

Detective Shawn Campbell met with defendant in the interview room at the police station. Campbell noted that defendant was complaining about rectal pain and added that defendant was "calm, cooperative, seem[ing] kind of detached from the situation." Campbell explained that defendant told him that on the day he killed his father, his father came into his room and "grasp[ed] his thigh." Defendant then admitted to Campbell that he hit his father with a bat and stabbed him with a knife. Campbell explained that defendant gave him two specific examples of alleged sexual assaults: one when he was three years old and woke up after having wet the bed to find his father standing over him, and the second when he was nine years old and his father asked him to "kiss his butt."

Campbell continued that defendant asked to see him because defendant wanted to provide a confession to "clear his dad's name and explain to his family what happened." Defendant thereafter provided a written confession, which he later read aloud. Defendant's verbal statement included a reference to being on LSD, a claim that defendant had not included in his written statement–indeed, Campbell explained that defendant had previously told him that he was not on LSD.

### B. Defendant's Case in Chief

In support of his insanity defense, defendant presented the following evidence from his employer, family members, friends, a police officer, and mental health experts.

### 1. *George Bartlow*

George Bartlow, defendant's supervisor at Jewel grocery store, testified that a day or two before the murder, defendant was acting depressed, "staring off into the distance." When Bartlow asked defendant whether he was "okay," defendant responded that he was. Bartlow added that defendant's behavior was not that unusual; "[h]e was never talkative or anything."

### 2. *Andrew Lucas*

Andrew Lucas, defendant's coworker, had seen defendant in the days before he learned that Joseph had been killed and noted that he "wasn't the same." He was "much quieter."

### 3. *Jane Fender*

Jane Fender, defendant's maternal grandmother, testified that her mother and grandmother's sister suffered from mental illness. She said that her mother would often threaten to kill the family, and her aunt died in a psychiatric hospital. Fender added that her daughter, defendant's mother, suffered from depression, and her cousin's son had been diagnosed schizophrenic.

### 4. *Mark Slagel*

Mark Slagel, a friend of defendant's brother, watched a movie with defendant the night

before defendant killed his father and noted that defendant was "real quiet" and "kept to himself." Slagel added that although he had only met defendant once or twice before, defendant appeared to be off, "star[ing] off occasionally." He noticed that defendant was also writing something on a sheet of paper, but the writings did not seem to "make any sense."

¶ 40                                    5. *James Leggett*

¶ 41    James Leggett, the brother of defendant's roommate, knew defendant and his family and saw defendant two to three times per week. Leggett explained that he watched a movie with defendant and others the night before defendant killed his father, noting that defendant seemed a little more quiet than normal. Leggett described defendant as "[f]unny, outgoing, and compassionate" but noted that defendant was none of those things the night they watched the movie. He added that defendant was "doodling" on a piece of paper during the movie, and left the apartment after midnight.

¶ 42    Leggett further testified that he knew that defendant had used LSD in the past but did not see him use LSD that evening. When Leggett saw defendant use LSD in the past, he did not notice any apparent changes in defendant's behavior.

¶ 43                                    6. *Dr. Lawrence Jeckel*

¶ 44    Dr. Lawrence Jeckel, a forensic psychiatrist, reviewed defendant's records–including family history–and conducted a clinical evaluation of defendant. Jeckel opined that defendant "lacked substantial capacity to appreciate the criminality of his conduct at the time of the crime" in this case. Jeckel based his opinion on his conclusion that defendant suffered from delusions, hallucinations, and a "psychotic disorder, not otherwise specified." Jeckel noted that defendant actually loved his father but, through his delusions, believed that God wanted him to kill his father and that his father was homosexual. Jeckel continued that he found no evidence of premeditation or motivation in defendant's actions. Defendant was effectively acting out on a delusion that his father had been sexually abusing him. Jeckel further opined that defendant's psychotic episode the night he killed his father was not the result of his LSD use several days before. Jeckel explained that his research revealed that the effects of LSD did not extend beyond 12 hours.

¶ 45    On cross-examination, Jeckel said that defendant admitted to him that defendant had been using cannabis up to three times per day prior to killing his father. Jeckel also conceded that most of his opinion regarding the effects of LSD were garnered from articles and texts, rather than experience in his practice.

¶ 46                                    7. *Officer Beth Acuncius*

¶ 47    Officer Beth Acuncius testified that at 2 a.m. on August 13, 2008, she was on patrol when she received a call reporting a burglary in progress; a man was trying to "make entry to a house." The homeowners heard glass break and saw that someone was pounding on their front door, screaming that someone was trying to kill him and pleading to come in. Acuncius explained that she and other officers apprehended defendant and, as they were escorting him

to the police car, he was kicking and flailing, screaming that he was going to kill them, adding, "he *** was screaming in terror the whole time." The police took defendant to the hospital, where he admitted to Acuncius that he had ingested LSD and mushrooms.

¶ 48 Acuncius further testified that she spoke to defendant on August 15, 2008. She said that defendant sounded lucid and, in fact, noted that he had contacted the victims to apologize and pay for the damage he had caused.

¶ 49                                              8. *Acardia Kust*

¶ 50 Acardia Kust, the girlfriend of defendant's brother, would visit with defendant "at least" three times per week and noted that he appeared to love his father and that the two appeared to have a good relationship. When she first met defendant, he was funny and outgoing, but he started to become more isolated and withdrawn "about a year" before he killed Joseph.

¶ 51 On August 13, 2008, when Kust was "hanging out" with defendant and some other friends, she observed defendant ingest LSD. Kust also recounted an August 16, 2009, trip, in which she went camping with defendant and several other friends. (The trip took place the Saturday before the murder on Friday.) Defendant used LSD that Saturday as well. Then, on Thursday of that week–the day before the murder–Kust saw defendant smoke cannabis while they were "hanging out" with their friends. She added that defendant used cannabis "[o]n a daily basis." Kust later identified the piece of scratch paper that had previously been admitted into evidence as the piece of paper defendant was scribbling on that Thursday night (August 20, 2009).

¶ 52                                              9. *Brian McCauley*

¶ 53 Brian McCauley, defendant's older brother, testified that during college he lived with defendant and Joseph. Brian noted that defendant's attitude changed the year leading up to the murder, and defendant "stayed inside a lot." Brian added that he "absolutely" did not ever see any physical fights between defendant and their father.

¶ 54 Brian witnessed defendant ingest LSD on August 13, 2008, as well as during the summer of 2007. Brian recalled a Wisconsin camping trip that he had taken in early August 2009 with defendant and their mother. Defendant seemed depressed one of the nights on the trip. Brian further recounted the August 16, 2009, camping trip he took with defendant and their friends, where defendant used LSD. (That trip took place approximately five days before the murder.) He said that defendant became very quiet and would "just stare off." When they returned from the camping trip, defendant stayed with Brian and became very "aggressive," doing push-ups until it hurt and shadow boxing. In the period between the camping trip and his father's murder, defendant was acting "weird."

¶ 55 Defendant ingested cannabis the Thursday before his father's murder. Brian also identified the piece of paper that defendant had written on the previous night, trying, for the most part unsuccessfully, to decipher for counsel what defendant's writings meant.

¶ 56                                    10. *Dr. Terry M. Killian*

¶ 57       Dr. Terry M. Killian, a psychiatrist who evaluated defendant, testified that he met with
defendant and reviewed defendant's writings and the police report. Killian concluded that
defendant suffered from a psychotic disorder, not otherwise specified, and because of that
condition, defendant was unable to appreciate the criminality of his conduct. Killian
explained how he reached his diagnosis, as follows:

> "In addition to the many things that [defendant] told me about the week prior to
> killing *** his father, there were things in the police reports that supported that. At the
> time he was arrested, the police made comments about some of the odd things that
> [defendant] was saying. [Defendant] was taken to the emergency room shortly thereafter
> ***. And the emergency room [personnel] also commented on his odd behavior and odd
> statements. There were a number of witness statements who described him as being off
> in some way that week, out of it. One particular, a man named Mark Slagel *** described
> [defendant's] behavior more specifically than some of the other witnesses did and
> specifically described [defendant] saying off things and then sitting back down and Mr.
> Slagel looked at the paper that [defendant] was writing and described the writing as being
> very odd with words capitalized or circled for no particular reasons."

Defense counsel elicited additional information regarding Killian's diagnosis as follows:

> "[COUNSEL:] Okay. With regard to his comments, as to believing that his father had
> molested him, is that something that you considered in coming to your conclusion?
>
> [KILLIAN:] Absolutely. It was one of the central issues ***. [Defendant] developed
> during the last week before his father's killing a firm belief that his father had been
> molesting him. And his description of that is–[defendant's] description of the evidence
> for it was 'off' sort of things. In other words, I'll digress for just a moment. As I
> mentioned earlier, I've had four years of almost full-time work treating chronically
> psychotic patients. And there is a way that psychotic patients *** describe events that is
> different from the way other people describe things and their reasoning about how they
> conclude something happened is different. [Defendant] *** did not describe
> remembering having been molested. [']I remember on this date such and such a thing
> happened.['] It wasn't that. It would–he–it would be he would awaken with pain in his
> rectum and to him that meant that he had been molested by his father, the sort of odd
> connections that are typical of people with psychotic illnesses. So [defendant] had
> developed a firm belief that his father had been molesting him, that his father was going
> to molest him and that he had to protect himself."

Killian added that defendant's family history of mental illness also factored into his
diagnoses and conclusion that defendant was insane.

¶ 58       Killian further testified that he considered whether drug use could have been the cause
for defendant's psychotic symptoms. On that point, Killian emphasized that defendant's
"episode" was triggered by his use of LSD, but this was not the same as saying that it was
caused by LSD. Killian explained that "the episode may have been triggered initially by LSD
but then took on a life of its own." The LSD use triggered defendant's psychotic symptoms
but was out of defendant's system by the time he killed his father; the LSD started the

problem but things "took on a life of [their] own because of [defendant's] vulnerability." Killian continued that if the murder had taken place "in the hours after the LSD ingestion," he would have concluded that defendant was not insane. Killian concluded by noting that defendant's psychosis was not the result of cannabis use, given that defendant had used cannabis so often "throughout his teen years."

### 11. *Lori Fender*

Lori Fender, defendant's mother, testified that while defendant was living with her he was "outgoing" and "very popular." Fender explained that defendant's relationship with his father was loving, "they cared deeply about each other." Fender said that she had a family history of mental illness–indeed, she indicated that she was being treated for depression. She added that when she met with defendant at the jail after the murder, he appeared calm, explaining that he had killed his father but would "be back at school on Tuesday." Fender noted that she had been concerned about defendant's mental health for years, given that he was a "worrier" when it came to medical issues.

### C. The State's Rebuttal Evidence

Following defendant's case in chief, the State presented testimony from police officers, healthcare personnel from the jail, and its own, board-certified addiction specialist to rebut defendant's insanity defense.

### 1. *Officer Jeff Longfellow*

Officer Jeff Longfellow responded to the August 13, 2008, report of a burglary in progress at the scene of which defendant was arrested. Longfellow explained that defendant was "upset," thrashing around "uncontrollably" and making statements that he wanted the officers to "kill him." Defendant then began saying that he wanted to kill the officers or have them shoot each other. Longfellow added that defendant was in a rage and that he could smell alcohol on defendant's breath as he began to talk to him. Longfellow added that, based on his experience responding to calls in a college town, he thought "pretty quickly" that defendant was on "some type of hallucinogenic drug."

### 2. *Officer Greg Liepold*

Officer Greg Liepold testified that on August 13, 2008, he responded to the call and interviewed the victim, who said that someone had broken her window and "was yelling things." Liepold explained that he thereafter found defendant "hunkered down" in an area with high weeds near the house; defendant was screaming (1) for officers to kill him and (2) that someone was trying to kill him. Liepold corroborated the other officers' testimony that defendant was "erratic and violent." He said that it took five or six officers to get defendant "under control."

### 3. *Linda Wells*

Linda Wells, a nurse at the jail, testified regarding defendant's health assessment the night he was brought in for killing his father. She performed the health assessment, and defendant acknowledged having a drug abuse problem with "weed." She performed a "mini mental exam" on defendant and did not note any concerns–indeed, defendant received a perfect score in responding to inquiries. Following Wells' September 3, 2008, examination of defendant, she did not refer defendant for mental health treatment because he "didn't respond inappropriately" to any of the questions she asked and she "didn't see any mental health issues."

### 4. *Dr. Gil Abelita*

Dr. Gil Abelita, the psychiatrist who provided services for defendant at the jail, testified that on September 8, 2009, she responded to a request from staff because defendant was "tearful and depressed." She met with defendant, who said that he was "fine" and refused her offer to proscribe him medication to help with depression. Abelita opined that, other than his depression, defendant was "appropriate." Abelita followed up with defendant on September 22, 2009, and found that his condition had not changed. She also met with defendant a few times in October 2009, found that his condition had "not changed much," but nonetheless prescribed him an antidepressant. Abelita met with defendant in November 2009, and he mentioned for the first time that he heard "walkie-talkie" noises that were "coinciding with his thinking." Defendant also mentioned that the television was talking to him, which she viewed as a psychotic issue. Other than the walkie-talkie and television-talking-to-him incidents, defendant interacted with her "appropriately and logically."

### 5. *Dr. Stafford Henry*

Dr. Stafford Henry, who was board certified in forensic psychiatry and addiction psychiatry, testified that he examined defendant and defendant's history, including the reports prepared by defendant's other treating psychiatrists. Henry explained that he had treated–in a clinical environment–hundreds of patients who were suffering from psychotic disorders who had problems with drug use, including LSD and cannabis. Henry opined that he believed that "to a reasonable degree of medical and psychiatric certainty," defendant was legally sane at the time he killed his father. Specifically, Henry opined that no evidence existed that defendant "was suffering from *** an underlying functional psychiatric illness which would have resulted in him lacking substantial capacity to appreciate the criminality of his conduct."

Henry further testified that he believed that defendant was suffering from delusions on August 21, 2009, but that those delusions were the "direct result of the voluntary, deliberate and conscious self-administration of mood-altering substances." In response, the prosecutor inquired, as follows: "So[,] in your opinion[,] is it possible for someone to be suffering from delusions and to be psychotic and be sane?" Henry responded, "Oh, absolutely." Henry explained his treatment approach in the following exchange:

"[PROSECUTOR:] Would it be fair to say that your job as an expert when evaluating

a case of substance abuse or use and sanity that you need to be able to differentiate between a[n] actual psychiatric illness and a psychotic episode caused by substance use?

[HENRY:] Absolutely, absolutely. You need to *** make that distinction. I find you need to make that distinction and you need to be meticulous in how you go about examining one's mental state especially in that critical window immediately prior to and leading up to the offense. It is *** absolutely critical. It's the kind of analysis that, you know, I've been doing for years and that I learned as a resident and fellow and that I practice every day.

[PROSECUTOR:] Now, Doctor, was this the approach that you used specifically when you were evaluating the information and examination of this defendant ***?

[HENRY:] Absolutely, absolutely. What I did is I did a very thorough review of [defendant's] entire history. I was meticulous in *** having him take me through his entire life, screening for the presence of psychiatric illness and symptoms, and I was meticulous in screening for his substance abuse history, especially given the matters that bring us here today."

¶ 74 Henry continued that defendant's mother had affected him adversely by implying to him at a very young age that his father may be molesting him and later telling defendant that his father was homosexual. Defendant idolized "stoners" and used drugs consistently. Henry focused on defendant's history of substance abuse, explaining why as follows:

"[Defendant's history of substance abuse is] especially important in this case because this is a drug case in my opinion. As a forensic psychiatrist you try to focus on what is obvious, what is clinically relevant and what is reasonable. And in my opinion this is a drug case, and so as this is a drug case, I took a very–in addition to looking at his entire history, I paid especially close attention to his use of drugs."

¶ 75 Henry then explained the effects of hallucinogenic drugs such as LSD, noting that the effects of those drugs are very unpredictable, hence the term "bad trip." Henry explained further how that unpredictability affected this case in the following exchange:

"[PROSECUTOR:] Now, this unpredictability that you say is a hallmark of LSD usage, could that unpredictability also be affected if there are other drugs that are being used at the time or in close proximity to the LSD?

[HENRY:] Absolutely, and that's especially true of cannabis. In fact, you know, I was just kind of reading through a chapter in the Encyclopedia of Substance Abuse, Prevention, Treatment and Rehabilitation, right before I came down here, and the first paragraph, not only does it talk about the variability of LSD, but it specifically mentions that when a person on LSD uses cannabis, which cannabis in and of itself can cause psychosis, and there is a designation in DSM IV specifically for cannabis delusions because cannabis can cause psychosis, when LSD is used in combination with other drugs there is a possibility of psychotic reaction, which in my opinion is exactly what happened with [defendant].

[PROSECUTOR:] Now, Doctor, based on your training and your practical experience and your–just your overall professional treatment of different patients, is it possible for a person to suffer the effects of LSD days after ingesting it?

-11-

[HENRY:] It is. That possibility exists, *** especially if there are other drugs–especially if the person has self-administered other drugs, like cannabis.

[PROSECUTOR:] Now, when they're suffering these effects of LSD days later, is it possible to suffer them weeks later?

[HENRY:] It's possible to suffer weeks late[r]. That is *** less rare.

[PROSECUTOR:] Now, if they're still suffering the effects days after ingesting the LSD, is the LSD still present in their system?

[HENRY:] Oh, no, no. The LSD is rather quickly eliminated, and I think, again, not to be critical of the defense experts, that's really a critical point that I don't think that they got.

[PROSECUTOR:] Now, let me stop you ***. But have you reviewed the reports of Dr. Killian and Dr. Jeckel?

[HENRY:] I have.

[PROSECUTOR:] And is that what you're referring to when you are discussing the critical point they missed?

[HENRY:] Right, and again, I don't *** want to *** criticize them, but, we respectfully disagree on the data in this case because it's important to understand that the psychosis and the delusions which follow a substance such as LSD [*are*] not due to the LSD or even its bi-products, which are broken down very quickly. It's the chemical changes in the brain that are precipitated by the LSD. It is those chemical changes in the brain that cause the psychosis and the delusions. And so to say [defendant] didn't have any LSD in his system at the time of the crime, therefore, LSD is not a cause of his delusions, unfortunately reflects a lack of understanding of very basic physiology because it is not the substance that causes the thought disorder. It is the biochemical changes in the brain that cause the thought disorder and that is *** what can persist. And when you think about the millions of chemicals in the brain, that thought disorder and those chemical imbalances, they could persist for an intermediate period of time and that explains the *** variability.

[PROSECUTOR:] Now, Doctor, is it your opinion that in this case the ingestion of LSD and the chemical changes caused by that LSD was what brought about this defendant's delusions and psychotic thoughts on August 21, 2009?

[HENRY:] I'm of the opinion to a reasonable degree of medical and psychiatric certainty that it's not just the LSD. I think it's really critical and–and I again I mean no disrespect to Dr. Killian and Dr. Jeckel, but they missed the point. It was not just the LSD because in my *** conducting this case, I methodically went through [defendant's] behaviors and thoughts in the critical window. Dr. Jeckel and Dr. Killian could say they do, but their reports don't reflect it, and, their reports don't reflect that on Thursday night, the night before the murder, while [defendant] in his own words was trying to suppress thoughts, he *** self-administered cannabis. He voluntarily and deliberately took cannabis, which his brother Bryan gave to him, and by [defendant's] own account after he took the cannabis, he then had a resurgence of the psychotic episode, the psychotic

-12-

symptoms. [Defendant] was exceedingly clear on this point. He said, 'I was trying to suppress these thoughts.' He took the cannabis that his brother *** gave him, and unequivocally he was very clear, there was an exacerbation of a delusional material. That critical point was not in Dr. Jeckel's or Dr. Killian's report, which not to be critical of them, in my mind simply reflects their–simply reflects that we do not come to this case with comparable clinical acumen, experience, or credentials."

¶ 76 Henry then turned to describing what defendant told him about the night and day before he killed his father. Defendant told Henry that the night before he killed his father, he believed his father was going to come into his room and penetrate his anus. He said that nothing happened so he apologized to his father for "being weird" the next morning and then went to his classes. That evening, defendant spent time at Kust's apartment, which Henry indicated was a "critical point," as follows:

"This is a critical point. This is a critical point because we're not at the critical window immediately prior to the occurrence of the alleged offense. This is a critical point the [defendant] said, quote, [']I was trying to block out the thoughts['], end quote."

Henry said that this was important because defendant voluntarily ingested cannabis during that time. Defendant told him that shortly thereafter, "the thoughts started up again" and that the television started communicating with him. He said that one of the video-game characters was telling him to kill his father–that his father was the "first person on the list"–and that "it might be a good night for him to rape [defendant]." Henry added that defendant told him that defendant felt that if he went to bed, his father was going to rape him, and he was going to have to kill his father, that doing so would allow him to "pass the test."

¶ 77 Henry also described "ideas of reference," which he defined as "an idiosyncratic interpretation of normal stimuli." Henry outlined the following example for the prosecutor: "An idea of reference would mean that because you have on a blue blouse, you're telling me that I'm going to be home today by six o'clock." Henry said that defendant was "very clear" during his interview that he had never experienced ideas of reference prior to "his voluntary self-administration of LSD, alcohol, and cannabis the Sunday before the crime."

¶ 78 Henry explained that five days after defendant killed his father, defendant recanted the allegations of sexual abuse, noting that that was completely normal, as follows:

"The fact that several days out the biochemical changes that were precipitated and induced [defendant's] voluntary self-administration of the drugs were beginning to correct themselves. That is what we call homeostasis. It's a pretty kind of elementary physiological process. Our bodies try to get back to a point of normalcy. And so five days out, he's in a relatively sterile environment away from drugs and *** his thoughts become more reality based."

¶ 79 After hearing this evidence, the trial court took the case under advisement.

¶ 80 D. The Trial Court's Findings

¶ 81 The trial court later found defendant guilty but mentally ill, and provided an extensive, detailed explanation of the court's decision. We have set forth some of the court's most

-13-

pertinent findings, as follows:

"The evidence in this case is very clear that a criminal agency caused the death, that being blunt force trauma and stabbing. The People have clearly proved beyond a reasonable doubt the corpus delecti in this case.

The next issue then becomes whether the People have proven beyond a reasonable doubt that it was the charged defendant in this case, Liam McCauley, who was that criminal agency that caused the death. And, again, there is really no dispute in the evidence factually. Clearly in this case there is more than enough evidence beyond a reasonable doubt that it was, in fact, the defendant *** who beat and stabbed the victim to death, and, therefore, the court finds that the People have proven beyond a reasonable doubt that the defendant *** is guilty of first degree murder as charged in Counts One, Two and Three of the indictment.

That does not end the analysis here because the defendant has asserted the affirmative defense of insanity, and as everyone in the room knows, that is the issue in this case. Again, for the purposes of the record and for the benefit of those listening, Illinois law defines insanity. Basically the law says that a person is not criminally responsible for conduct if at the time of that conduct as a result of mental disease of mental defect he lacks substantial capacity to appreciate the criminality of his conduct. And under that same statute as well as another section of the Criminal Code, the defense bears the burden of proving insanity by what is called clear and convincing evidence. So what has been the defendant's evidence on that issue?

After reviewing all the evidence, and, again, I'm being somewhat simplistic here, and I apologize for that, but it doesn't mean that I haven't considered all of the evidence, but I think the defendant's evidence can be kind of summarized as three points, and that is, first of all, the *** defense presented evidence of the defendant's behavior, his demeanor prior to the offense here and in the course of the time prior to that. ***

Secondly, the evidence presented suggests a lack of apparent motive or any kind of rational explanation for this offense; and third, the defendant's evidence on the issue of insanity, of course, included the professional opinions of both Dr. Jeckel and Dr. Killian.

The People in rebuttal presented evidence that I think can be kind of broken down into two points, and that is primarily that the defendant had apparent comprehension and ability to function and understand in a formal fashion immediately after the crime when he was in contact with the police and so forth, and, of course, secondly, the expert opinion of Dr. Henry.

*** [W]hat is really kind of unusual in this case is the fact that all three experts are in substantial agreement that at the time of the offense the defendant was suffering from psychotic symptoms and principally those were delusions, although others have also been discussed and mentioned. And additionally all three agree at various points in their testimony that if the defendant's psychotic episode resulted from an existing underlying primary psychotic disorder which is, in fact, a mental disease or defect, [that] would cause him to be unable to appreciate the criminality of his conduct. They further agree *** that if his psychotic behavior was the direct result of or caused by the voluntary

-14-

ingestion of illegal mood-altering substances, then that would not be a mental disease or defect as required by the insanity statute; and, therefore, the defendant would be criminally responsible. So, in essence, that is the crux of the issue in this case; and the disagreement of the experts on that question hinges on the root cause of the defendant's psychotic behavior.

Now the court has carefully examined the qualifications of the experts, the basis for the opinions that they've offered, as well as the reasonableness of those opinions in light of all the other evidence in the case. All three of these witnesses, the expert witnesses, have extensive credentials. There is not question about that. They all have extensive education and experience in the field of psychiatry. But there is one thing that I think *** significantly differentiates these witnesses, and I think it's important in this case, frankly; and that is all three of them are board certified in general psychiatry. Two of them, Dr. Jeckel and Dr. Henry, are also board certified in forensic psychiatry. But only one of the experts, and that being Dr. Henry, is board certified in addiction psychiatry.

Now board certification is not some magical talisman that somehow automatically makes one more credible than someone who is not board certified; however, I think it is significant in this case. I think it's also significant that Dr. Jeckel acknowledged in his testimony that addiction psychiatry is what he termed a complex field, and, frankly, in this case, Dr. Henry is the only expert with credentials in this complex field.

Both defense experts acknowledged further that they had to affirmatively engage in additional research on the effects of hallucinogenic drugs and psychotic symptoms in how those things interrelate. *** In short, the court believes that Dr. Henry's additional education and experience over and above that of the defense experts provides in the court's view a higher level of credibility as to his opinions in this particular case with its very unique facts and the interplay of the defendant's drug usage and resultant psychotic symptoms.

Additionally, Dr. Henry's explanations and conclusions I believe are supported by other evidence in the case. The evidence showed that this defendant *** had only one prior psychotic episode, and that was following his usage of LSD in August of 2008. The episode that led to the murder *** in this case also followed LSD usage by the defendant. The defense experts both opined that the LSD usage was not the cause of the psychosis relevant to the charges here primarily because of the lapse of time between the ingestion and the crime. And those opinions were based on the short duration of LSD and its physical presence and effects in the body, and the testimony varied somewhat but basically was that those bi-products and effects would be gone within 12 to 24 hours; and, therefore, the defendant was not under the influence, if you will, anymore when he committed the offense on August 21st.

Dr. Killian indicated in his testimony that had the murder taken place, and I believe his exact words were if it were in the hours following LSD ingestion, then he would have concluded that the psychosis was due to LSD, and he would, therefore, have found the defendant to be criminally responsible.

But, again, it's not argued or advanced or even supported here that the defendant was

somehow under the influence or intoxicated at the time of the murder. Dr. Henry, based on his additional experience and familiarity with addiction and drug issues, explained that it's not the presence of the drug but the effect it has on the body's chemical balance that causes and sustains the psychotic reaction. And according to his testimony, that effect outlasts the drug's physical presence in the body.

After much contemplation and review of the other experts' testimony, the court finds that that particular evidence is both persuasive and credible.

Now, additionally, that evidence is supported further by Dr. Henry's explanation as to the apparent waning, if you will, and I couldn't come up with a better word than that, of the defendant's delusions and the sudden resurgence after he then ingested cannabis in the hours before the murder. ***

Dr. Henry explained and in his explanation is certainly consistent with those observations that the defendant was reporting attempts to try to suppress his thoughts that afternoon, which was consistent with Dr. Henry's explanation that the chemical imbalances caused by the LSD earlier were beginning to resolve. But Dr. Henry further testified that in his opinion after the defendant ingested further mood-altering substances, that being on cannabis on the evening of Thursday, that witnesses then reported the defendant again becoming withdrawn and quiet and disconnected; and that was the time frame when the defendant was writing names on a piece of paper and other things that were admitted into evidence. Dr. Henry again explained that this in his opinion resulted from the cannabis once again interfering with the chemical balance in the defendant's brain and, if you will, reinforcing his psychotic thoughts.

Now, I also noted in the testimony as a side note here that Dr. Jeckel acknowledged that there were studies he was aware indicating that marijuana use in and of itself could dispose one to psychosis, which I think lends some further credibility to Dr. Henry's explanation.

The evidence establishes that it was only hours after the ingestion of cannabis on Thursday night and only days after ingesting LSD that the defendant went home and killed his father.

The court finds that Dr. Henry's opinion, that the psychotic state that led the defendant to commit the murder that morning, was directly caused by his voluntary ingestion of mood-altering drugs, that that opinion is both credible and supported by the other evidence in this case.

Therefore, the court finds that the defendant has not met his burden of proving by clear and convincing evidence that he was legally insane at the time of the murder.

Now, the Illinois Code of Criminal Procedure, specifically in Section 115-3, addresses the court's responsibility in a bench trial in which the defense of insanity is presented, and Subsection C of that section indicates that the court, if it finds that the State has proven the charge beyond a reasonable doubt, which the court has found, and that the defense has failed to prove insanity, which the court has also found, may then enter a verdict of guilty or guilty but mentally ill. But the guilty but mentally ill verdict may only be entered if the court finds by a preponderance of the evidence that the

defendant was mentally ill at the time of the crime, and that term 'mentally ill' is defined in Illinois law as a substantial disorder of thought, mood or behavior which afflicted a person at the time of the offense and which impaired that person's judgment.

Based upon all the evidence in this case, the court finds that it is more probably true than not true that the defendant was, in fact, mentally ill at the [time] of the commission of the crime; therefore, the court will enter a verdict of guilty but mentally ill on the charges of first degree murder in this case."

¶ 82 Following a September 2010 sentencing hearing, the trial court sentenced defendant to 27 years in prison.

¶ 83 This appeal followed.

¶ 84 <center>II. ANALYSIS</center>

¶ 85 Defendant argues that the trial court erred by finding him guilty but mentally ill of first degree murder because he did not meet the statutory definition of "voluntary intoxication" and he had proved that he was insane at the time of the murder. Alternatively, defendant argues that the trial court erred by (1) failing to *sua sponte* find him guilty of the lesser-mitigated offense of second degree murder and (2) imposing an excessive sentence. We address defendant's contentions in turn.

¶ 86 <center>A. Defendant's Contention That He Did Not Meet<br>the Statutory Definition of "Voluntary Intoxication"</center>

¶ 87 Defendant first contends that the trial court erred by finding him guilty but mentally ill of first degree murder because he did not meet the statutory definition of "voluntary intoxication" or "a drugged condition" under section 6-3 of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/6-3 (West 2008)) and, therefore, was insane at the time he murdered his father. We disagree.

¶ 88 <center>1. *Insanity Under the Criminal Code*</center>

¶ 89 Section 6-2(a) of the Criminal Code provides for the defense of insanity, as follows:

"A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2008).

¶ 90 <center>2. *Involuntary Intoxication Under Section 6-3 of the Criminal Code*</center>

¶ 91 Section 6-3 of the Criminal Code explains when a person is involuntarily intoxicated as follows:

"A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." 720 ILCS 5/6-3 (West 2008).

<center>-17-</center>

¶ 92 With these statutory provisions in mind, we turn now to defendant's claim on appeal that the trial court erred by finding that defendant was not involuntarily intoxicated.

¶ 93 3. *Defendant's Contention on Appeal That He Was Not Voluntarily Intoxicated or in a Drugged Condition*

¶ 94 As previously stated, defendant contends that he did not meet the statutory definition of "voluntary intoxication" or "a drugged condition" under section 6-3 of the Criminal Code (720 ILCS 5/6-3 (West 2008)) and, therefore, was insane at the time he killed his father. Defendant's claim in this regard, however, misapprehends the trial court's findings in this case.

¶ 95 Initially, we note that we have outlined the trial court's findings of fact in this case at length, in part, to demonstrate why the court concluded that defendant failed to show by clear and convincing evidence that he was insane at the time he murdered his father. Contrary to defendant's assertion, the court, as fact finder, did not find that defendant was voluntarily intoxicated or in a drugged condition under section 6-3 of the Criminal Code in rendering its verdict. Instead, the court found persuasive Dr. Henry's testimony that defendant's voluntary drug and alcohol use merely *triggered*–as opposed to caused–his psychosis. In other words, the court found that defendant was not insane because defendant's psychosis was brought on by his drug and alcohol use, not a primary mental illness that would cause him to "lack substantial capacity to appreciate the criminality of his conduct."

¶ 96 The question before the trial court, as fact finder, was whether defendant was insane under section 6-2 of the Criminal Code at the time he killed his father. The court did not determine whether defendant was voluntarily intoxicated under section 6-3 of the Criminal Code, and for good reason; defendant never claimed that he was involuntarily intoxicated. That is one reason why we emphasized in the heading to this section of our opinion defendant's "contention on appeal." Defendant did not raise this contention to the trial court. See *People v. Hari*, 218 Ill. 2d 275, 291, 843 N.E.2d 349, 359 (2006) (section 6-3 of the Criminal Code applies when the defendant argues that he was involuntarily intoxicated). Indeed, as we have outlined at length and will summarize again later in this opinion, defendant's affirmative defense at trial was that he was insane, in part, precisely *because* he was not intoxicated, involuntarily or otherwise.

¶ 97 Because our review of the evidence presented, as well as the trial court's findings, demonstrates that the court did not consider section 6-3 of the Criminal Code, but simply found that defendant failed to meet his burden to show that he was insane at the time he murdered his father, we reject defendant's argument that the court improperly concluded that he was voluntarily intoxicated under section 6-3 of the Criminal Code.

¶ 98 In closing, we note that, in his reply brief, defendant points out that the question presented is "whether the facts of this case meet the statutory definition of 'voluntary intoxication.'" For the reasons we have outlined above, we reject defendant's position in this regard. Whether defendant was voluntarily intoxicated was not an issue in this case because neither party made it one.

¶ 99        B. Defendant's Claim That He Proved by Clear and Convincing Evidence
                That He Was Insane at the Time He Killed His Father

¶ 100       Defendant next contends that he proved by clear and convincing evidence that he was
            insane at the time he killed his father, a position that the State failed to rebut. Defendant
            posits that because all three experts concluded that defendant was insane, only disagreeing
            as to the cause of the psychosis, the trial court's finding that defendant was not insane was
            against the manifest weight of the evidence. Defendant's contention again misapprehends
            the trial court's findings.

¶ 101                       1. *Insanity and the Standard of Review*

¶ 102       As previously explained, "[a] person is not criminally responsible for conduct if at the
            time of such conduct, as a result of mental disease or mental defect, he lacks substantial
            capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2008). When
            a defendant presents this defense at trial, commonly known as "the insanity defense," he
            bears the burden of proving by clear and convincing evidence that he is not guilty by reason
            of insanity. *People v. Manns*, 373 Ill. App. 3d 232, 238, 869 N.E.2d 437, 441 (2007); 720
            ILCS 5/6-2(e) (West 2008).

¶ 103       Because the existence of a "mental disease or mental defect" under section 6-2 of the
            Criminal Code is a question of fact, the trier of fact's sanity determination will not be
            overturned unless it is contrary to the manifest weight of the evidence. *People v. Urdiales*,
            225 Ill. 2d 354, 428, 871 N.E.2d 669, 712 (2007). Moreover, "because the trier of fact
            determines the weight to be given to testimony, witness credibility and the reasonable
            inferences to be drawn from the testimony, and resolves any inconsistencies or conflicts in
            the evidence, a reviewing court will not substitute its judgment for that of the trier of fact."
            *People v. Houseworth*, 388 Ill. App. 3d 37, 51, 903 N.E.2d 1, 12 (2008) (citing *People v.
            Sutherland*, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006)).

¶ 104                   2. *The Evidence in This Case Regarding Defendant's Sanity*

¶ 105       The State proved in its case in chief that defendant killed his father by striking him with
            a baseball bat and stabbing him numerous times. Defendant did not dispute that. Instead,
            defendant, in his case in chief, presented evidence that he lacked substantial capacity to
            appreciate the criminality of his conduct–that is, he argued that he was insane. To prove that
            he was insane, defendant presented expert testimony from two forensic psychiatrists, Doctors
            Jeckel and Killian.

¶ 106       Jeckel opined that defendant "lacked substantial capacity to appreciate the criminality of
            his conduct at the time of the crime" because defendant suffered from delusions,
            hallucinations, a "psychotic disorder, not otherwise specified." Jeckel found that defendant
            was effectively acting out on a delusion that his father had been sexually abusing him. Jeckel
            added that defendant's psychotic episode was not the result of his LSD use several days
            before, as his *research* revealed that the effects of LSD did not extend beyond 12 hours. He
            acknowledged, however, that most of his opinion regarding the effects of LSD were garnered

from articles and texts, rather than experience in his practice.

¶ 107    For his part, Killian testified that defendant suffered from a psychotic disorder, not otherwise specified, and because of that condition, defendant was unable to appreciate the criminality of his conduct. Killian explained defendant had developed a firm belief that his father had been molesting him, that his father was going to molest him, and that he had to protect himself. Killian added that defendant's family history of mental illness also factored into his conclusion that defendant was insane. Killian opined that defendant's "episode" was triggered by his use of LSD, but this was not the same as saying that it was caused by LSD. Killian explained that "the episode may have been triggered initially by LSD but then took on a life of its own." The LSD use triggered defendant's psychotic symptoms but was out of defendant's system by the time he killed his father; the LSD started the problem but things "took on a life of [their] own because of [defendant's] vulnerability." Killian continued that if the murder had taken place "in the hours after the LSD ingestion," he would have concluded that defendant was not insane. Killian concluded by noting that defendant's psychosis was not the result of cannabis use, given that defendant had used cannabis so often "throughout his teen years."

¶ 108    To rebut defendant's insanity defense, the State called its own expert, Dr. Henry, a psychiatrist who was board certified in forensic and addiction psychiatry. We earlier referred to Henry's testimony at length and will not repeat that discussion. Nevertheless, we note some highlights of that testimony.

¶ 109    Henry testified that he had treated–in a clinical environment–hundreds of patients who were suffering from psychotic disorders and had problems with drug use, including LSD and cannabis. Henry opined that "to a reasonable degree of medical and psychiatric certainty," defendant was legally sane at the time he killed his father because no evidence existed that defendant "was suffering from *** an underlying functional psychiatric illness which would have resulted in him lacking substantial capacity to appreciate the criminality of his conduct." That is, defendant was functional, but his drug use triggered his psychotic episode. Henry believed that defendant was suffering from delusions on August 21, 2009, but that those delusions were the "direct result of the voluntary, deliberate, and conscious self-administration of mood-altering substances"; in other words, it was possible for someone to be suffering from delusions and to be psychotic and be legally sane.

¶ 110                          3. *The Trial Court's Findings*

¶ 111    We earlier referred to the trial court's findings at length and will not repeat that discussion. Instead, we simply note that the court set forth its findings with great detail and precision.

¶ 112    As the trial court explained, all three experts opined that defendant suffered from serious mental illness before he ingested the LSD and cannabis in this case. This is contrary to defendant's claim that the record "does not support the trial court's conclusion." Henry's expert testimony showed that defendant's cannabis use hours before he killed his father "triggered" his psychosis–which was affected by his earlier LSD use–and that defendant was not legally insane.

¶ 113　　The trial court's findings as fact finder will be reversed only if they are contrary to the manifest weight of the evidence (*Urdiales*, 225 Ill. 2d at 428, 871 N.E.2d at 712), and we accord great deference to the trial court's factual findings. *People v. Close*, 238 Ill. 2d 497, 504, 939 N.E.2d 463, 467 (2010); *People v. Bailey*, 409 Ill. App. 3d 574, 586, 948 N.E.2d 690, 704 (2011) ("the trier of fact is the sole arbiter of the credibility of witnesses and it is not the function of the appellate court to substitute its judgment for that of the trier of fact"). Indeed, " '[a] judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.' " *People v. Jackson*, 2012 IL App (1st) 103300, ¶ 13, 979 N.E.2d 965 (quoting *Bazydlo v. Volant*, 164 Ill. 2d 207, 215, 647 N.E.2d 273, 277 (1995)).

¶ 114　　In this case, the experienced trial court heard evidence from three psychiatrists as well as several lay witnesses regarding defendant's sanity at the time he killed his father. The court explained that it accepted and adopted the expert opinion of the psychiatrist who was both board certified in forensic psychiatry *and* addiction psychiatry that defendant was mentally ill, but that his psychosis that led him to murder his father was brought about by his use of cannabis, which triggered psychotic thoughts that were the result of the chemical changes in his brain that began when he ingested the LSD several days before. After carefully reviewing this record, we conclude that the court's findings were not against the manifest weight of the evidence. Indeed, we conclude those findings are soundly based.

¶ 115　　Although cases involving addiction psychiatry are scarce, we find support for our conclusion in the decision of the Supreme Court of Vermont in *State v. Sexton*, 2006 VT 55, 180 Vt. 34, 904 A.2d 1092. In *Sexton*, the court addressed, in pertinent part, the defendant's claim that he should have been permitted to present an insanity defense at his murder trial. *Sexton*, 2006 VT 55, ¶ 1, 180 Vt. 34, 904 A.2d 1092. The defendant had proffered evidence from his expert psychiatrist that the defendant's psychosis at the time of the murder was a "straight substance-induced psychosis" because "LSD may continue to affect the user weeks after its last ingestion" or caused when "the LSD triggered a latent mental disease or defect." *Sexton*, 2006 VT 55, ¶ 30, 180 Vt. 34, 904 A.2d 1092. The supreme court concluded that although the defendant was entitled to argue that he had diminished capacity to form the requisite intent to commit murder, it rejected the defendant's claim that he was entitled to argue that he was insane on the basis of a short-term, voluntary consumption of LSD that activated a latent mental disease or defect. *Sexton*, 2006 VT 55, ¶ 33, 180 Vt. 34, 904 A.2d 1092. The supreme court noted that to conclude otherwise would require it to ignore the "fundamental principle that a defendant is not excused from criminal liability for acts [that] result from a mental state that is self-induced through the voluntary ingestion of illegal drugs or alcohol." *Sexton*, 2006 VT 55, ¶¶ 33, 44, 180 Vt. 34, 904 A.2d 1092 ("the law may *reduce* an individual's culpability in such circumstances, but will not *excuse* it" (emphases in original)). Similarly, for this court to conclude that the trial court's findings were against the manifest weight of the evidence, we would have to ignore Henry's expert opinion that defendant's previous, temporary LSD use and cannabis ingestion the night of the murder "triggered" defendant's otherwise latent mental illness. We refuse to do so, as the court was in the best position to evaluate that testimony.

¶ 116           C. Defendant's Claim That the Trial Court Should Have
                *Sua Sponte* Found Him Guilty of Second Degree Murder

¶ 117      Alternatively, defendant contends that the trial court should have *sua sponte* found him
guilty of the lesser-mitigated offense of second degree murder. Defendant posits that if he
was intoxicated such that his "judgment and perception were impaired," it could "lead a
reasonable trier of fact to conclude that, at the time of the offense, he was under the mistaken
belief that his actions were justified." Defendant is correct that a reasonable trier of fact *could*
have so found, but, based on the evidence presented in this case, this experienced trial court
did not.

¶ 118      As defendant posits, the trial court is presumed to know the law (see *People v. Robinson*,
368 Ill. App. 3d 963, 976, 859 N.E.2d 232, 246 (2006) ("A reviewing court presumes the
trial judge in a bench trial knew the law and followed it, and that 'presumption may only be
rebutted when the record affirmatively shows otherwise.' *People v. Thorne*, 352 Ill. App. 3d
1062[, 817 N.E.2d 1163] (2004).")), including, of course, the law related to lesser-included
and lesser-mitigated offenses. Accordingly, we may presume that the trial court rejected the
lesser-mitigated offense of second degree murder under the facts of this case. See *People v.
Walton*, 378 Ill. App. 3d 580, 588, 880 N.E.2d 993, 1000 (2007) (a trial court may convict
a defendant of the lesser-mitigated offense of second degree murder *sua sponte*, but the court
is not required to do so). Indeed, perhaps the best evidence that the trial court in this case
knew the applicable law is the fact that the court *sua sponte* found defendant guilty but
mentally ill under section 6-2(c) of the Criminal Code.


¶ 119              D. Defendant's Claim That the Trial Court Erred
                        by Imposing an Excessive Sentence

¶ 120      Defendant next contends that the trial court erred by imposing an excessive sentence.
Specifically, defendant asserts that the trial court abused its discretion by imposing a 27-year
sentence, given that he was psychotic, 20 years old when he murdered his father, and he had
no criminal history other than the " '*de minimis*' misdemeanor charge that resulted from the
2008 incident." We disagree.

¶ 121      This court recently reiterated the standard for reviewing excessive-sentence claims, as
follows:

       "The sentence imposed by a trial court is granted great deference because the court
       is generally in a better position than a reviewing court to weigh factors such as the
       defendant's credibility, demeanor, general moral character, mentality, social
       environment, and habits. *People v. Calabrese*, 398 Ill. App. 3d 98, 126, 924 N.E.2d 6,
       29 (2010). This deference provides a trial court the latitude to impose a sentence that falls
       within the statutory range prescribed for the offense. *People v. Perkins*, 408 Ill. App. 3d
       752, 763, 945 N.E.2d 1228, 1238 (2011). A sentence that is within statutory limits is
       excessive and, thus, an abuse of the court's discretion only when it is greatly at variance
       with the spirit and purpose of the law, or manifestly disproportionate to the nature of the
       offense. See *People v. Luna*, 409 Ill. App. 3d 45, 52, 946 N.E.2d 1102, 1110 (2011)."
       *People v. Brunner*, 2012 IL App (4th) 100708, ¶ 40, 976 N.E.2d 27.

¶ 122    Following defendant's September 2010 sentencing hearing, the trial court sentenced defendant to 27 years in prison and–commendably–explained its reasoning in great detail. We note the following excerpts:

"Today a *** troubled young man, in the court's view, faces the prospect of a significant loss of liberty, while a family and a community have forever lost a father and a brother and a friend and a colleague.

***

*** [T]he court certainly recognizes and has taken into account *** mitigating evidence, and in particular I think that includes the lack of any significant prior criminal history, the defendant's youth, and evidence of his mental illness, which, as I have previously found in the verdict that was returned in this case, seriously impaired the defendant's judgment and certainly contributed to the commission of this brutal and senseless crime.

*** I hope that everyone understands that the court gave considerable consideration to the evidence in this case. I think I stated at the time I announced the [court's decision] in this case, and I will restate it now, that this is perhaps the most difficult decision that this court has been called upon to make. *** You look at the offense in this case, that crime that was committed, and then you look at the defendant and his history and his character as has been testified to by so many people, and the only thing that one can do is scream out why, how, how did this happen. It is senseless. It is completely and utterly senseless. ***

***

The finding that the court made in this case of guilty but mentally ill [requires the court] to sentence the defendant to a term in the Department of Corrections, [and] the law does require that the Department of Corrections conduct evaluations of the defendant, and the statute goes on [to] say that the department has an obligation to provide the defendant with such psychiatric, psychological or other counseling and treatment as it determines necessity.

Now that puts the discretion of that in the Department of Corrections.

***

Understanding the significance of the mitigation that's been presented here, the court also wants to state and reaffirm the [decision] in this case, and I will again state that *** I believe that the evidence has established that the defendant was legally responsible for his behavior in the early morning hours of August the 21st and was, therefore, legally responsible for the violent and unprovoked attack upon his own father.

For that reason, the court believes that something in excess of the minimum sentence must be imposed in this case, for a lot of the reasons that the State put forth and for those reasons that I have indicated. ***

The court can also not fashion a sentence to guarantee the defendant's mental health will be restored or that he will some day become a contributing and productive member of society. I can't fashion a sentence to guarantee that. I can only fashion a sentence that

takes into account all of the facts involved in this case, the law that applies to it, the history and circumstances of this defendant and with that sentence try to indicate to the community that violence that leads to senseless death, no matter what the reasons for or the triggers of that violence is and always will be a serious and devastating act which the law must treat with a requisite amount of seriousness.

For all of these reasons, the court does hereby sentence the defendant *** to a term of 27 years in the Illinois Department of Corrections."

¶ 123    The trial court noted at the sentencing hearing that it had considered the presentence investigation report, the evidence offered in aggravation and mitigation, as well as the sentencing recommendations made by defense counsel and the State. The court thereafter sentenced defendant to 27 years in prison, a sentence which falls at the lower end of the 20- to 60-year sentencing range for the murder committed in this case. 730 ILCS 5/5-8-1(a)(1) (West 2008) (text of section effective until June 1, 2009). Our review of the record clearly demonstrates that the court did not abuse its discretion in imposing the 27-year prison sentence in this case.

¶ 124                                 III. CONCLUSION

¶ 125    For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment as costs of this appeal.

¶ 126    Affirmed.